1   JOHN JASNOCH
    SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
2   707 Broadway, Suite 1000
    San Diego, California 92101
3   Telephone: (619) 233-4565
    Facsimile: (619) 233-0508
4   Email: jjasnoch@scott-scott.com

5   THOMAS L. LAUGHLIN, IV
    SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
6   The Chrysler Building
    405 Lexington Avenue, 40th Floor
7   New York, New York 10174
    Telephone: (212) 223-6444
8   Facsimile: (212) 223-6334

9   *Attorneys for Plaintiff*

10  [Additional counsel on signature page.]

11

12              UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14

15  WEST PALM BEACH FIRE PENSION FUND,        Case No.

16                          Plaintiff,

17          v.

18  LAWRENCE "LARRY" PAGE, SERGEY M.          **VERIFIED SHAREHOLDER**
    BRIN, ERIC E. SCHMIDT, L. JOHN DOERR,     **DERIVATIVE COMPLAINT**
19  DIANE B. GREENE, JOHN L. HENNESSY, ANN
    MATHER, PAUL S. OTELLINI, K. RAM
20  SHRIRAM, SHIRLEY M. TILGHMAN,
    MICHAEL J. MORITZ, ARTHUR D. LEVINSON,
21  ROBERT ALAN EUSTACE, OMID R.
    KORDESTANI, JONATHAN J. ROSENBERG,
22  SHONA L. BROWN, and ARNNON GESHURI,

23                          Defendants,

24          and

25  GOOGLE, INC,

26                          Nominal Defendant.

27

28

## PROLOGUE

"[T]here is ample evidence of an overarching conspiracy between" Google and the other defendants, and of "evidence of Defendants' rigid wage structures and internal equity concerns, along with statements from Defendants' own executives, are likely to prove compelling in establishing the impact of the anti-solicitation agreements . . . ."

*In re High-Tech Employee Antitrust Litig.*, No. 11-cv-2509, 2014 WL 3917126, at *16 (N.D. Cal. Aug. 8, 2014).

Plaintiff West Palm Beach Fire Pension Fund ("West Palm" or "Plaintiff"), on behalf of Google, Inc. ("Google" or the "Company"), derivatively alleges upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon a review of publicly available information, including Securities and Exchange Commission ("SEC") filings by Google and media reports about Google and Defendants, the following:

## I.    INTRODUCTION AND SUMMARY OF CLAIMS

1.    This is a shareholder's derivative action brought on behalf of and for the benefit of Google, Inc. ("Google" or the "Company") against Google's Board of Directors (the "Director Defendants"),[1] for breaches of fiduciary duties of loyalty, good faith, and candor, arising from their reckless mismanagement in connection with Google's systemic violations of federal laws governing its business activities.   Defendants caused or condoned Google's conspiracy to repeatedly and persistently violate federal antitrust laws, with several of its Silicon Valley colleagues, by engaging in a multi-year scheme to illegally suppress competition and wages for high-tech employees in Silicon Valley, thereby effectively undermining innovation in technology.   These violations occurred as far back as 2005 and continued over several years.

2.    By 2009, Google had become the subject of an investigation led by the Antitrust Division of the United States Department of Justice ("DOJ").   The DOJ eventually determined that Google's agreements were "facially anticompetitive because they eliminated a significant

---

[1]    All of Google's present Board of Directors are named as Defendants in this action, with the exception of Alan R. Mulally, who did not join the Google Board until July 2014, after the misconduct alleged herein had transpired.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
1

form of competition to attract high tech employees, and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities."  The DOJ's case was settled in September 2010, which required Google and its anticompetitive colleagues to end their illegal agreements.

3.     Then in 2011, several technical, creative, and research and development employees harmed by the illegal anticompetitive agreements filed class action lawsuits against Google, Apple Inc. ("Apple"), Intel Corp. ("Intel"), Intuit Inc. ("Intuit"), and Adobe Systems Inc. ("Adobe"), among others, for conspiring to suppress their wages, including by agreeing not to actively recruit each other's employees.  These actions were later consolidated in *In re High-Tech Employee Antitrust Litigation*, No. 11-cv-2509-LHK (N.D. Cal.) (the "Antitrust Class Action").  In August 2014, the Court in the Antitrust Class Action rejected a settlement of $324.5 million.  In January 2015, the remaining parties, including Google, filed a new proposed settlement with the Court, in which the remaining Defendants would pay $415 million to the impacted class members.  On March 3, 2015, the Court granted preliminary approval of the revised settlement and scheduled a final approval hearing for July 9, 2015.

4.     When Google was still relatively new to the Silicon Valley scene, Google had a strong reputation for recruiting the very best employees from other prominent Silicon Valley companies by offering the best compensation and benefits to its employees.  Initially, Defendant Eric E. Schmidt ("Schmidt"), who was at that time Google's Chief Executive Officer, expressly rejected implementation of a policy against poaching the employees of Google's competitors.  In a November 5, 2003 email, Schmidt wrote that Google's "policy should be to have 'no rule.'"

5.     By 2005, however, Defendants Lawrence "Larry" Page ("Page"), Sergey M. Brin ("Brin"), Schmidt, and other Google executives began developing and entering into illegal anticompetitive agreements with their counterparts at other companies, including Apple, Intel, and Intuit.  These agreements were designed to illegally restrain the cartel members from hiring each other's high-tech employees and to artificially suppress compensation for such employees.

As *Bloomberg BusinessWeek* reported, "Silicon Valley's vast wealth and a warped sense of entitlement led to an audacious conspiracy to suppress salaries."[2]

6. In 2005, Apple's co-founder and former Chief Executive Officer Steve Jobs ("Jobs") began contacting Google executives, including Defendant Brin, irate that Google was purportedly recruiting Apple employees. Jobs also contacted William V. Campbell ("Campbell"), a close friend and member of Apple's Board of Directors, to express his anger. Campbell was also a Senior Advisor at Google and a mentor to Defendant Schmidt, and regularly attended meetings of Google's Board of Directors (the "Board") and Google's Executive Management Group.

7. Defendants Page, Brin, and Schmidt responded by implementing an illegal policy of not recruiting employees from Apple, Intel, and Genentech, Inc. ("Genentech") under the pretense of the relationships these Defendants had with these companies. Defendant Schmidt explained: "Genentech and Intel had board members that were board members of Google [Former Director Defendant Arthur D. Levinson and Defendant Paul S. Otellini], and . . . Art Levinson was the CEO of Genentech[,] Paul Otellini was the CEO of Intel[,], . . . and Bill Campbell was a board member of Apple . . . . [W]e did not want a situation where you had a sitting board member and we were cold calling into their companies."

8. Soon, Google expanded the list of companies on its "Do Not Call" list to include companies that did not share board members with Google.

9. These agreements: (1) prevented companies within the cartel from actively recruiting or "cold calling" each other's employees; (2) required notification and collusion before one cartel member made an employment offer to an employee of another cartel member; and/or (3) prevented companies from making counteroffers with salaries above the initial employment offer to ensure that salaries remained artificially deflated. These agreements were intended to,

---

[2]    Paul M. Barrett and Brad Stone, *Apple, Google, and the Hubris of Silicon Valley's Hiring Conspiracy*, BLOOMBERG, May 1, 2014, http://www.businessweek.com/articles/2014-05-01/tech-hubris-the-silicon-valley-antitrust-hiring-conspiracy. Visited Mar. 18, 2015.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

3

1   and did, suppress the compensation and mobility of highly skilled technical employees, which

2   improperly restricted competition for skilled labor in Silicon Valley.

3       10.    Director Defendants Page, Brin, Schmidt, and Paul S. Otellini ("Otellini") were

4   directly involved in forging these illegal, anticompetitive agreements and implementing and

5   maintaining practices consistent with these agreements.  Additional executive Defendants named

6   herein also played significant roles in the development, ratification, and implementation of these

7   illegal policies and protocols.

8       11.    In addition to suppressing employee compensation, these illegal, anticompetitive

9   agreements also stunted the success of Silicon Valley's innovation by limiting the free flow of

10  employees between companies.  Defendants benefited from these agreements to the detriment of

11  the Company and its shareholders.

12      12.    All of this misconduct is heavily documented by emails, which were introduced in

13  other court proceedings.   These emails are specifically detailed throughout this complaint.

14  Indeed, in the Antitrust Class Action, the Court noted that "there is ample evidence of an

15  overarching conspiracy between" Google and the other Defendants, and of "evidence of

16  Defendants' rigid wage structures and internal equity concerns, along with statements from

17  Defendants' own executives, are likely to prove compelling in establishing the impact of the

18  anti-solicitation agreements . . . ."  *See High-Tech Employee*, 2014 WL 3917126, at *16.

19      13.    This shareholder derivative action seeks to recover damages on behalf of Google,

20  caused by the unlawful acts and omissions of Defendants.

21  **II.    JURISDICTION AND VENUE**

22      14.    This derivative action is brought pursuant to Rule 23.1 of the Federal Rules of

23  Civil Procedure ("F.R.C.P.").

24      15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, because

25  the claims asserted arise under §§14(a) and 29(b) of the Securities Exchange Act of 1934 (the

26  "Exchange Act") (15 U.S.C. §§78n(a) and 78cc(b)).

27

28

16.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2).  Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.

17.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     This Court has personal jurisdiction over each Defendant because each Defendant has committed acts related to the claims at issue in this Complaint within this District.

19.     Venue is proper in the Northern District of California because Nominal Defendant Google is headquartered in this District, in Mountain View, California, and a number of the Director Defendants are citizens of the State of California.  Additionally, venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.

**III.     PARTIES**

20.     Plaintiff West Palm Beach Fire Pension Fund is a shareholder of Google and has continuously held its shares at times relevant hereto.  West Palm is a citizen of Florida.

21.     Nominal Defendant Google is a Delaware corporation with its principal executive offices located at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google is a global technology leader focused on improving the ways people connect with information.  The Company aspires to build products and provide services that improve the lives of billions of people worldwide.  The Company's mission is to organize the world's information and make it universally accessible and useful.  Google's innovations in web search and advertising have made its website a top internet property, and Google's brand one of the most recognized in the world.  Indeed, "to Google" something is now a recognized verb in popular lexicon.  Google generates most of its revenue by delivering relevant, cost-effective online advertising.

22.     Defendant Lawrence "Larry" Page is a co-founder of Google, has been a member of Google's Board of Directors since 1998, and has served as Google's Chief Executive Officer since April 2011.  Defendant Page has served in numerous executive capacities at Google, including as the Company's President, Products from July 2001 to April 2011; Chief Financial Officer from September 1998 to July 2002; and CEO from September 1998 to July 2001. Defendant Page is one of the primary wrongdoers involved in this misconduct alleged herein, having overseen the creation of the illegal and anticompetitive agreements between Google and other companies, caused the Company to enter into these agreements, and failed to implement adequate internal controls to ensure Google's compliance with federal law and regulations. Defendant Page caused the Company to disseminate false and misleading Proxy Statements in 2012, 2013, and 2014.  Upon information and belief, Defendant Page is a citizen of California.

23.     Defendant Sergey M. Brin is a co-founder of Google, has been a member of Google's Board of Directors since 1998, and presently directs special projects for Google. Defendant Brin has served in numerous executive capacities at Google, including as the Company's President, Technology from July 2001 to April 2011 and President and Chairman of the Board from September 1998 to July 2001.  Defendant Brin is one of the primary wrongdoers involved in this misconduct alleged herein, having overseen the creation of the illegal and anticompetitive agreements between Google and other companies, caused the Company to enter into these agreements, and failed to implement adequate internal controls to ensure Google's compliance with federal law and regulations.   Defendant Brin caused the Company to disseminate false and misleading Proxy Statements in 2012, 2013, and 2014.  Upon information and belief, Defendant Brin is a citizen of California.

24.     Defendant Eric E. Schmidt has been a member of Google's Board of Directors since March 2001 and has served as Google's Executive Chairman of the Board since April 2011.  Defendant Schmidt has served in numerous executive capacities at Google, including as the Company's Chief Executive Officer from July 2001 to April 2011, and Chairman of the Board from March 2001 to April 2004 and April 2007 to April 2011.  Defendant Schmidt also

served on the Apple Board of Directors from August 2006 to July 2009, during part of the period of wrongdoing alleged herein.  Defendant Schmidt is one of the primary wrongdoers involved in this misconduct alleged herein, having overseen the creation of the illegal and anticompetitive agreements between Google and other companies, caused the Company to enter into these agreements, and failed to implement adequate internal controls to ensure Google's compliance with federal law and regulations.  Defendant Schmidt caused the Company to disseminate false and misleading Proxy Statements in 2012, 2013, and 2014.   Upon information and belief, Defendant Schmidt is a citizen of California.

25.    Defendant L. John Doerr ("Doerr") has been a member of Google's Board of Directors since May 1999.  Defendant Doerr has also served on Google's Audit Committee from May 2007 to January 2012 and Google's Leadership Development and Compensation Committee from April 2005 to May 2007 and again from October 2009 to present.  Defendant Doerr also served on the Intuit Board of Directors from 1999 to December 2007, during the period of wrongdoing alleged herein.  Defendant Doerr knowingly and consciously: (i) allowed Defendants Page, Brin, and Schmidt to dominate and control the Board with little or no effective oversight; (ii) upon information and belief, explicitly agreed to or facilitated the creation of illegal anticompetitive agreements with certain of Google's competitors, including Intuit, where Doerr served on the Board; (iii) caused or allowed Google to enter into such illegal anticompetitive agreements; (iv) upon information and belief, actively ensured the illegal anticompetitive agreements were followed within Google; and (v) failed to implement adequate internal controls to ensure Google's compliance with federal law and regulations.  Defendant Doerr caused the Company to disseminate false and misleading Proxy Statements in 2012, 2013, and 2014.   Between 2009 and 2012, Google paid Defendant Doerr almost $1.8 million in compensation.  Upon information and belief, Defendant Doerr is a citizen of California.

26.    Defendant Diane B. Greene ("Greene") has been a member of Google's Board of Directors since January 2012.  Defendant Greene presently serves on the Audit Committee of the Google Board of Directors.  Defendant Greene caused the Company to disseminate false and

1  misleading Proxy Statements in 2012, 2013, and 2014.  Upon information and belief, Defendant

2  Greene is a citizen of California.

3       27.    Defendant John L. Hennessy ("Hennessy") has been a member of Google's Board

4  of Directors since April 2004.   Defendant Hennessy has also served as Google's Lead

5  Independent Director Since April 2007.   Defendant Hennessy knowingly and consciously:

6  (i) allowed Defendants Page, Brin, and Schmidt to dominate and control the Board with little or

7  no effective oversight; (ii) upon information and belief, explicitly agreed to or facilitated the

8  creation of illegal anticompetitive agreements with certain of Google's competitors; (iii) caused

9  or allowed Google to enter into such illegal anticompetitive agreements; (iv) upon information

10  and belief, actively ensured the illegal anticompetitive agreements were followed within Google;

11  and (v) failed to implement adequate internal controls to ensure Google's compliance with

12  federal law and regulations.  Defendant Hennessy caused the Company to disseminate false and

13  misleading Proxy Statements in 2012, 2013, and 2014.  Between 2006 and 2012, Google paid

14  Defendant Hennessy over $3.2 million in compensation.   Upon information and belief,

15  Defendant Hennessy is a citizen of California.

16       28.    Defendant Ann Mather ("Mather") has been a member of Google's Board of

17  Directors since November 2005.  Defendant Mather has also served as Chairman of the Audit

18  Committee of Google's Board of Directors since November 2005.  Defendant Mather knowingly

19  and consciously: (i) allowed Defendants Page, Brin, and Schmidt to dominate and control the

20  Board with little or no effective oversight; (ii) upon information and belief, explicitly agreed to

21  or facilitated the creation of illegal anticompetitive agreements with certain of Google's

22  competitors; (iii) caused or allowed Google to enter into such illegal anticompetitive agreements;

23  (iv) upon information and belief, actively ensured the illegal anticompetitive agreements were

24  followed within Google; and (v) failed to implement adequate internal controls to ensure

25  Google's compliance with federal law and regulations.  Defendant Mather caused the Company

26  to disseminate false and misleading Proxy Statements in 2012, 2013, and 2014.  Between 2006

27

28

1    and 2012, Google paid Defendant Mather over $4.2 million in compensation.  Upon information

2    and belief, Defendant Mather is a citizen of California.

3        29.    Defendant Paul S. Otellini has been a member of Google's Board of Directors

4    since April 2004.  Defendant Otellini also served as a member of the Audit Committee of

5    Google's Board of Directors from April 2005 to January 2006 and as Chairman of the

6    Leadership Development and Compensation Committee of Google's Board of Directors from

7    October 2009 to present.  Defendant Otellini also held numerous executive roles at Intel during

8    the period of wrongdoing alleged herein, including as CEO and President from May 2005 to May

9    2013, a director from 2002 to May 2013, Chief Operating Officer from 2002 to May 2005, and

10   various other positions including Executive Vice President and General Manager, Intel

11   Architecture Group, and Executive Vice President and General Manager, Sales and Market

12   Group, from 1974 to 2002.  Defendant Otellini knowingly and consciously: (i) allowed

13   Defendants Page, Brin, and Schmidt to dominate and control the Board with little or no effective

14   oversight; (ii) upon information and belief, explicitly agreed to or facilitated the creation of

15   illegal anticompetitive agreements with certain of Google's competitors; (iii) caused or allowed

16   Google to enter into such illegal anticompetitive agreements; (iv) upon information and belief,

17   actively ensured the illegal anticompetitive agreements were followed within Google; and (v)

18   failed to implement adequate internal controls to ensure Google's compliance with federal law

19   and regulations.  Defendant Otellini caused the Company to disseminate false and misleading

20   Proxy Statements in 2012, 2013, and 2014.  Between 2006 and 2012, Google paid Defendant

21   Otellini over $3.1 million in compensation.  Upon information and belief, Defendant Otellini is a

22   citizen of California.

23       30.    Defendant K. Ram Shriram ("Shriram") has been a member of Google's Board of

24   Directors since September 1998.  Defendant Shriram also served as a member of the Audit

25   Committee of Google's Board of Directors since April 2005 and was Chairman of the Audit

26   Committee from April 2005 to November 2005.  Defendant Shriram knowingly and consciously:

27   (i) allowed Defendants Page, Brin, and Schmidt to dominate and control the Board with little or

28

no effective oversight; (ii) upon information and belief, explicitly agreed to or facilitated the creation of illegal anticompetitive agreements with certain of Google's competitors; (iii) caused or allowed Google to enter into such illegal anticompetitive agreements; (iv) upon information and belief, actively ensured the illegal anticompetitive agreements were followed within Google; and (v) failed to implement adequate internal controls to ensure Google's compliance with federal law and regulations.  Defendant Shriram caused the Company to disseminate false and misleading Proxy Statements in 2012, 2013, and 2014.  Between 2011 and 2012, Google paid Defendant Shriram $846,123 in compensation.  Upon information and belief, Defendant Shriram is a citizen of California.

31.     Defendant Shirley M. Tilghman ("Tilghman") has been a member of Google's Board of Directors since October 2005.  Defendant Tilghman knowingly and consciously: (i) allowed Defendants Page, Brin, and Schmidt to dominate and control the Board with little or no effective oversight; (ii) upon information and belief, explicitly agreed to or facilitated the creation of illegal anticompetitive agreements with certain of Google's competitors; (iii) caused or allowed Google to enter into such illegal anticompetitive agreements; (iv) upon information and belief, actively ensured the illegal anticompetitive agreements were followed within Google; and (v) failed to implement adequate internal controls to ensure Google's compliance with federal law and regulations.  Defendant Tilghman caused the Company to disseminate false and misleading Proxy Statements in 2012, 2013 and 2014.  Between 2011 and 2012, Google paid Defendant Tilghman $846,123 in compensation.   Upon information and belief, Defendant Tilghman is a citizen of New Jersey.

32.     Defendant Michael J. Moritz ("Moritz") was a member of Google's Board of Directors from May 1999 to May 2007.  Defendant Moritz also served as a member of the Audit Committee of Google's Board of Directors from April 2005 to May 2007.  Defendant Moritz knowingly and consciously: (i) allowed Defendants Page, Brin, and Schmidt to dominate and control the Board with little or no effective oversight; (ii) upon information and belief, explicitly agreed to or facilitated the creation of illegal anticompetitive agreements with certain of

1  Google's competitors; (iii) caused or allowed Google to enter into such illegal anticompetitive

2  agreements; (iv) upon information and belief, actively ensured the illegal anticompetitive

3  agreements were followed within Google; and (v) failed to implement adequate internal controls

4  to ensure Google's compliance with federal law and regulations.  Upon information and belief,

5  Defendant Moritz is a citizen of California.

6  33.    Defendant Arthur D. Levinson ("Levinson") was a member of Google's Board of

7  Directors from April 2004 to October 2009.  Defendant Levinson also served as a member of the

8  Leadership Development and Compensation Committee from April 2005 to October 2009.

9  Defendant Levinson is also Chairman of the Board of Apple, where he has been a director since

10 2000 and the Chairman since November 2011.  Defendant Levinson knowingly and consciously:

11 (i) allowed Defendants Page, Brin, and Schmidt to dominate and control the Board with little or

12 no effective oversight; (ii) upon information and belief, explicitly agreed to or facilitated the

13 creation of illegal anticompetitive agreements with certain of Google's competitors; (iii) caused

14 or allowed Google to enter into such illegal anticompetitive agreements; (iv) upon information

15 and belief, actively ensured the illegal anticompetitive agreements were followed within Google;

16 and (v) failed to implement adequate internal controls to ensure Google's compliance with

17 federal law and regulations.  Between 2006 and 2009, Google paid Defendant Levinson over

18 $1.8 million in compensation.  Upon information and belief, Defendant Levinson is a citizen of

19 California.

20 34.    Defendant Robert Alan Eustace ("Eustace") has served as Google's Senior Vice

21 President, Knowledge since April 2011.  Defendant Eustace also served as Google's Senior Vice

22 President, Engineering & Research from January 2006 to April 2011 and Vice President of

23 Engineering from July 2002 to January 2006.  Defendant Eustace was involved in developing

24 and perpetuating the illegal collusive scheme alleged herein.  Defendant Eustace knowingly,

25 recklessly, or with gross negligence: (i) oversaw the creation of the protocols governing

26 anticompetitive hiring agreements between Google and other companies; (ii) caused or allowed

27 Google to enter into such illegal anticompetitive agreements; (iii) allowed Defendants Page,

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
11

Brin, and Schmidt to dominate and control the Google Board of Directors with little or no effective oversight; and (iv) failed to implement adequate internal controls to ensure that Google complied with federal laws and regulations.  Between 2006 and 2010, Google paid Eustace over $47.2 million in compensation.  Upon information and belief, Defendant Eustace is a citizen of California.

35.     Defendant Omid R. Kordestani ("Kordestani") served as Google's Senior Vice President of Global Sales and Business Development from May 1999 to April 2009.  Upon information and belief, Defendant Kordestani still works as an employee of Google, serving as a Special Advisor, Office of the CEO and Founders.  Defendant Kordestani was involved in developing and perpetuating the illegal collusive scheme alleged herein.  Defendant Kordestani knowingly, recklessly, or with gross negligence: (i) oversaw the creation of the protocols governing anticompetitive hiring agreements between Google and other companies; (ii) caused or allowed Google to enter into such illegal anticompetitive agreements; (iii) allowed Defendants Page, Brin, and Schmidt to dominate and control the Google Board of Directors with little or no effective oversight; and (iv) failed to implement adequate internal controls to ensure that Google complied with federal laws and regulations.  In 2007 alone, Google paid Defendant Kordestani almost $5.6 million in compensation.  Upon information and belief, Defendant Kordestani is a citizen of California.

36.     Defendant Jonathan J. Rosenberg ("Rosenberg") served as Google's Senior Vice President of Product Management from January 2006 to April 2011 and Vice President of Product Management from February 2002 to January 2006.  Defendant Eustace was involved in developing and perpetuating the illegal collusive scheme alleged herein.  Defendant Rosenberg knowingly, recklessly, or with gross negligence: (i) oversaw the creation of the protocols governing anticompetitive hiring agreements between Google and other companies; (ii) caused or allowed Google to enter into such illegal anticompetitive agreements; (iii) allowed Defendants Page, Brin, and Schmidt to dominate and control the Google Board of Directors with little or no effective oversight; and (iv) failed to implement adequate internal controls to ensure that Google

1  complied with federal laws and regulations. Between 2006 and 2009, Google paid Defendant

2  Rosenberg over $36 million in compensation. Upon information and belief, Defendant

3  Rosenberg is a citizen of California.

4       37.    Defendant Shona L. Brown ("Brown") served as Google's Senior Vice President,

5  Google.org from April 2011 to December 2012; Senior Vice President of Business Operations

6  from January 2006 to April 2011; and Vice President of Business Operations from September

7  2003 to January 2006. Defendant Eustace was involved in developing and perpetuating the

8  illegal collusive scheme alleged herein. Defendant Brown knowingly, recklessly, or with gross

9  negligence: (i) oversaw the creation of the protocols governing anticompetitive hiring

10  agreements between Google and other companies; (ii) caused or allowed Google to enter into

11  such illegal anticompetitive agreements; (iii) allowed Defendants Page, Brin, and Schmidt to

12  dominate and control the Google Board of Directors with little or no effective oversight; and (iv)

13  failed to implement adequate internal controls to ensure that Google complied with federal laws

14  and regulations. In 2006, Google paid Defendant Brown over $2.8 million in compensation. In

15  2010, Google paid Defendant Brown almost $16.3 million in compensation. Upon information

16  and belief, Defendant Brown is a citizen of California.

17       38.    Defendant Arnnon Geshuri ("Geshuri") has served as Google's Director of

18  Recruiting at all times relevant to this lawsuit. Defendant Geshuri was involved in developing

19  and perpetuating the illegal collusive scheme alleged herein. Defendant Geshuri knowingly,

20  recklessly, or with gross negligence: (i) oversaw the creation of the protocols governing

21  anticompetitive hiring agreements between Google and other companies; (ii) caused or allowed

22  Google to enter into such illegal anticompetitive agreements; (iii) allowed Defendants Page,

23  Brin, and Schmidt to dominate and control the Google Board of Directors with little or no

24  effective oversight; and (iv) failed to implement adequate internal controls to ensure that Google

25  complied with federal laws and regulations. Upon information and belief, Defendant Geshuri is

26  a citizen of California.

27

28

39.     Hereinafter, Defendants Page, Brin, Schmidt, Doerr, Greene, Hennessy, Mather, Otellini, Shriram, and Tilghman will be collectively referred to as the "Director Defendants." Defendants Moritz and Levinson will be collectively referred to as the "Former Director Defendants."     Defendants Eustace, Kordestani, Rosenberg, Brown, and Geshuri will be collectively referred to as the "Executive Defendants."    The Director Defendants, Former Director Defendants, and Executive Defendants will be collectively referred to as "Defendants."

## IV.    DEFENDANTS' FIDUCIARY DUTIES AND BREACHES THEREOF

40.     By reason of their positions as directors and fiduciaries of Google, and by virtue of their ability to control the business and corporate affairs of the Company, each Defendant owed and owes Google and its shareholders fiduciary obligations of trust, loyalty, good faith, and candor and were and are required to use their utmost ability to control and manage the Company in a lawful, fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Google and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

41.     Each Defendant owes to Google and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

42.     At all times relevant hereto, each Defendant was the agent of each of the other Defendants and of the Company, and was at all times acting within the course and scope of such agency.

43.     By virtue of their fiduciary duties of loyalty, good faith, trust, and candor, each Defendant was required to, among other things:

    a.    exercise good faith to ensure that Google's affairs were conducted in an efficient, business-like manner;

    b.    exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c.    when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
14

d.  remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

44.  The Defendants who were and are members of the committees of the Google Board of Directors assumed the responsibility to carry out the functions of their committees.

45.  Defendants knowingly or consciously breached their fiduciary duties of loyalty and good faith.  They did so by either causing themselves or allowing other Defendants to cause Google to enter into anticompetitive hiring agreements with Google's competitors.   These constitute illegal practices, which led to the waste of Google's assets and caused Google to incur significant reputational and monetary damages.

46.  By virtue of their positions of control and authority as directors and/or officers of Google, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  Defendants also failed to prevent other Defendants from their misconduct.

47.  Furthermore, by signing Google's 2012, 2013, and 2014 Annual Reports on SEC Form 10-K, and issuing Google's 2012, 2013, and 2014 Proxy Statements on Form 14-A without disclosing the violations of federal law and regulations alleged herein and affirmatively misrepresenting their practice of unlawfully suppressing their employees' compensation. Defendants breached their fiduciary duties of loyalty, good faith, and candor and violated the federal securities laws by making false and misleading statements to Google's shareholders and regulatory authorities.

## V.   GOOGLE'S CORPORATE GOVERNANCE STRUCTURE AND REQUIREMENTS

48.  Google's bylaws, articles of incorporation, corporate governance guidelines, and Code of Conduct, as well as Board committee charters, specifically set forth the duties and obligations that Google Board members are required to fulfill on behalf of the Company.

49.  Defendants, as corporate officers and directors of Google, owe the highest fiduciary duties of loyalty, good faith, and care to the Company.  This action involves serious violations of federal antitrust laws, by virtue of Google's illegal, anticompetitive restrictive

hiring agreements with other companies. Defendants either entered into these agreements themselves or consciously disregarded these agreements, blindly ignoring Google's participation in an unlawful antitrust conspiracy. Defendants, especially the Director Defendants and Former Director Defendants, performed no due diligence on Google's practice of unlawfully restricting competition that ultimately suppressed Google's high-tech talent and led to criminal penalties following an investigation by the DOJ.

50.     In a recent "Message from our Executive Chairman," Defendant Schmidt stated:

> We believe in the importance of building stockholder trust. ***We adhere to the highest levels of ethical business practices, as embodied by the Google Code of Conduct, which provides guidelines for ethical conduct by our directors, officers and employees.*** We think that we've created the optimal corporate structure to realize Google's long-term potential and have established the appropriate financial controls and management oversight of our internal process.

(Emphasis added.)

51.     Google's Annual Report for 2013 filed on Form 10-K with the SEC on February 12, 2014, which was signed by all of the Director defendants, directs:

> We take great pride in our culture . . . . We strive to hire the best employees, with backgrounds and perspectives as diverse as our global users . . . . Competition for qualified personnel in our industry is intense, particularly for software engineers, computer scientists, and other technical staff."

Defendants are and were therefore completely aware of the importance of hiring the best employees, yet failed to follow this basic tenet of business for several years.

52.     Google's most recent Annual Report for 2014 filed on Form 10-K, which was signed by all of the Director Defendants, reiterated the critical importance to the Company of hiring the best employees. It states:

> We take great pride in our culture. We embrace collaboration and creativity, and encourage the iteration of ideas to address complex technical challenges. . . . We strive to hire great employees, with backgrounds and perspectives as diverse as those of our global users. . . . Our employees are among our best assets and are critical for our continued success. We expect to continue investing in hiring talented employees and to provide competitive compensation programs to our employees.

## A. Google's Code of Conduct

53.     Google maintains a Code of Conduct which must be known and followed by all employees and Board members.[3]   Section VII of the Code of Conduct is entitled "Obey the Law," and requires that Defendants and the Company "comply with applicable legal requirements and prohibitions," and to "understand the major laws and regulations that apply."

54.     Section VII(2) is entitled "Competition Laws," and provides the following:

Most countries have laws – known as "antitrust," "competition," or "unfair competition" laws – designed to promote free and fair competition.  Generally speaking, these laws prohibit 1) arrangements with competitors that restrain trade in some way, 2) abuse of intellectual property rights, and 3) use of market power to unfairly disadvantage competitors.

Certain conduct is absolutely prohibited under these laws, and could result in your imprisonment, not to mention severe penalties for Google.   Examples of prohibited conduct include:

- agreeing with competitors about prices
- agreeing with competitors to rig bids or to allocate customers or markets
- agreeing with competitors to boycott a supplier or customer

Other activities can also be illegal, unfair, or create the appearance of impropriety. Such activities can include:

- sharing competitively sensitive information (e.g., prices, costs, market distribution, etc.) with competitors
- entering into a business arrangement or pursuing a strategy with the sole purpose of harming a competitor
- using Google's size or strength to gain an unfair competitive advantage

Although the spirit of these laws is straightforward, their application to particular situations can be quite complex.  Google is committed to competing fair and square, so please contact Ethics & Compliance if you have any questions about the antitrust laws and how they apply to you.  Any personnel found to have violated Google's antitrust policies will, subject to local laws, be disciplined, up to and including termination of employment.  If you suspect that anyone at the company is violating the competition laws, notify Ethics & Compliance immediately.

55.     The Corporate Governance Guidelines[4] also specify the responsibilities and duties of the Board:

---

[3]     *See* https://investor.google.com/corporate/code-of-conduct.html. Visited Mar. 18, 2015.

[4]     *See* https://investor.google.com/corporate/guidelines.html. Visited Mar. 18, 2015.

Principal Duties of the Board of Directors

To Oversee Management and Evaluate Strategy.  The fundamental responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be the best interests of Google and its stockholders.  It is the duty of the Board to oversee management's performance to ensure that Google operates in an effective, efficient and ethical manner in order to produce value for Google's stockholders.

56.     Furthermore, the Corporate Governance Guidelines address the Board's responsibilities with respect to oversight:

The Board is responsible for oversight of strategic, financial and execution risks and exposures associated with Google's business strategy, product innovation and sales road map, policy matters, significant litigation and regulatory exposures, and other current matters that may present material risk to Google's financial performance, operations, infrastructure, plans, prospects or reputation, acquisitions and divestitures.  Directors are expected to invest the time and effort necessary to understand Google's business and financial strategies and challenges.

### B.     Additional Responsibilities Based on Board Committee Membership

57.     Google has five standing committees of the Board of Directors: (1) Audit Committee; (2) Leadership Development and Compensation Committee; (3) Nominating and Corporate Governance Committee; (4) Executive Committee; and (5) Acquisition Committee. Each of these committees is required to report regularly to the full Google Board of Directors.

58.     Google's Leadership Development and Compensation Committee (the "LDCC") of the Board of Directors is charged with:

[B]roadly oversee[ing] matters relating to the attraction, motivation, development and retention of all Googlers.   In undertaking these responsibilities, the Committee shall take into account factors it deems appropriate from time to time, including Google's business strategy, the risks to Google and its business implied by its executive compensation and incentive programs and awards, and the results of any shareholder advisory votes with respect thereto.

59.     The LDCC is presently composed of Defendants Otellini (Chair), Doerr, and Shriram.  The LDCC has broad power over the retention of all Google employees.  As alleged herein, Defendant Otellini was directly involved in the development, ratification, and implementation of the illegal anti-solicitation covenants.  Furthermore, Defendants Doerr's and Shriram's relationships with Defendants Page, Brin, Schmidt, and Otellini, as well as non-

1  defendants like Jobs, demonstrate that these Defendants knew about the anticompetitive conduct

2  and allowed it to continue.

3       60.    The key function of the Audit Committee of Google's Board of Directors is to

4  oversee the accounting and financial reporting process.  This Committee also provides oversight

5  regarding significant financial matters, including Google's tax planning, treasury policies,

6  currency exposures, dividends, and share issuance and repurchases.  The Audit Committee must

7  supervise: Google's relationship with its independent auditors; internal controls; financial risk

8  oversight; and, *inter alia*, ability to investigate any matter brought to its attention.  The Audit

9  Committee has full access to all Google books, records, facilities, and employees.

10      61.    The Audit Committee is presently composed of Defendants Mather (Chair),

11 Greene, and non-defendant Mulally.  Defendant Mather specifically ignored or consciously and

12 blindly failed to account for the financial risk caused by allowing the anticompetitive hiring

13 practices to occur at Google.  Furthermore, Defendant Mather failed to require Google to

14 implement adequate internal controls.  By allowing the illegal anticompetitive practices to occur

15 and continue unchecked, Defendant Mather has caused Google to face a significant amount of

16 liability, in addition to other costs already incurred and lost goodwill.

17      62.    Google's Nominating and Corporate Governance Committee (the "NCGC") was

18 created to assist the Board in identifying individuals qualified to serve as members of the Board,

19 oversee Board evaluation and management, and develop and update corporate governance

20 principles.

21      63.    The NCGC is presently composed of Defendants Hennessy (Chair) and Tilghman.

22 As alleged herein, these Defendants have close ties and relationships to the other Director

23 Defendants.  If any Board member encouraged or voted to bring suit, these NCGC members

24 would therefore be unable to recommend their termination.  The NCGC could terminate any

25 Board member that attempted to go against the Board's anticompetitive practices or try to hold

26 the Board accountable for such misconduct.

27

28

64.   Google also has an Executive Committee, which is designed to serve as an administrative committee of the Board to act upon and facilitate the consideration by senior management and the Board of certain high-level business and strategic matters.

65.   The Executive Committee is presently composed of Defendants Schmidt (Chair), Page, and Brin.  These Defendants control Google and are among the principal wrongdoers.

66.   Google's Acquisition Committee is tasked with serving as an administrative committee of the Board to review and approve certain investment, acquisition, and divestiture transactions proposed by management.

67.   The Acquisition Committee is presently composed of Defendants Schmidt (Chair), Page, Brin, and Shriram.  Defendants Page, Brin, and Schmidt control Google and are among the principal wrongdoers.  Defendant Shriram has also been involved with Google since its inception and has close personal ties to many of the other Defendants.

## VI.   SUBSTANTIVE ALLEGATIONS

68.   Defendants, with their colleagues at rival companies including Apple, Adobe, and Intel, illegally conspired to drive down wages for over 100,000 workers in Silicon Valley.  This misconduct caused significant damage to Google and its shareholders.  Defendants caused and/or blindly looked away when Google entered into illegal anticompetitive hiring agreements with its rival companies.  These unlawful restraint of trade agreements were intended to and did, in fact, reduce employee compensation and mobility for high-tech employees.   Defendants had knowledge of the misconduct and were actively involved therein.

### A.   Background

69.   In a legal, competitive labor market, companies compete for the best employees. One of the most effective methods for identifying and luring the best employees is by soliciting employees presently working for other companies, a tactic referred to as "cold calling."[5]  Not only are such employees typically unresponsive to other recruiting strategies, but they are also,

---

[5]     Cold calling includes communicating directly with another company's employee who has not otherwise applied for a job opening, in any manner (including orally, in writing, telephonically, or electronically).

on average, significantly more valuable because employees who are not seeking other employment tend to be more qualified, hardworking, and stable than those who are actively seeking employment. In addition, cold calling the employees of a rival company provides tremendous cost savings because the hiring company can take advantage of the efforts its rival has already expended in performing background checks, interviewing, training, and evaluating skilled labor, among other things. Accordingly, cold calling is a key competitive tool companies use to recruit employees, particularly highly skilled technical employees.

70.     Employees also derive tremendous benefits from cold calling. For example, cold calling provides current employees with information about new job opportunities and potential pay packages. Even if they do not leave their present employment, learning about new opportunities affords current employees knowledge about the market and the potential ability to negotiate their present salaries and benefits. Furthermore, when a contacted employee shares cold call information with his or her coworkers, other employees can also learn of competitive pay rates and new job opportunities, which they may also use for their benefit. Thus, the effects of cold calling commonly impact all salaried employees. Furthermore, when an employer learns that its rivals are cold calling its employees, the employer will often preemptively increase compensation or other benefits to reduce the risk that its rivals will be able to poach undercompensated employees.

71.     For years, Silicon Valley companies like Google have had handshake agreements with each other to not cold call each other's employees.

72.     Adobe founder John E. Warnock explained:

> We were entering in a live-or-die kind of environment where we were exposed to all of the details of the [Apple] Macintosh, I mean, and worked hand in hand with their engineers. They were exposed to a lot of details in [Adobe] PostScript and I think in order to establish trust, [Adobe co-founder Charles M. Geschke] and I had a handshake agreement with Steve [Jobs] not to cold call their employees.

73.     Veteran Silicon Valley executive Bill Campbell ("Campbell") explained that similar "gentleman's agreements" had long been common among Valley companies with shared

1   board members, explaining, "it seemed like that was a practice that was being honored just out of

2   respect for the board member's time."

3                                    **B.      Google**

4          74.    Per an undated internal Google document titled "Special Agreement Hiring Policy

5   Protocol for 'Do Not Cold Call' and 'Sensitive' Companies," by at least 2005, and until at least

6   2010, Google began entering into agreements with its rivals to eliminate competition for

7   employees.  Google improperly agreed to not directly cold call or otherwise solicit employment

8   from any individuals employed at several specific companies, and each company in the cartel

9   agreed to the same conditions with Google.  These agreements were designed to, and did,

10  improperly restrict hiring, decrease employee mobility, and artificially deflate salaries

11  throughout Silicon Valley and also harmed Google and its shareholders.

12         75.    Furthermore, Google entered into illegal hiring agreements with companies it

13  deemed "Sensitive."  For such "Sensitive" companies, hiring restrictions applied to director-level

14  or higher candidates who Google engaged and had begun to interview.  For each company on the

15  "Sensitive" list, Google staffing was required to inform the Company's Executive Management

16  Group, who in turn designated a senior executive to either place a "courtesy call" into the

17  "Sensitive" company when an offer was made, or for certain undisclosed exceptions, call into the

18  "Sensitive" company to indicate that Google would be making an offer.  Defendants Brin, Page,

19  Schmidt, and Brown comprised the Executive Management Group, among others.  The latter

20  scenario allowed Google and its co-conspirators to restrict offers to certain employees that the

21  colluding companies' executives had orally agreed not to poach, and further, to ensure that the

22  salaries offered for such individuals did not exceed certain artificially low thresholds that had

23  been agreed upon between the companies.

24         76.    Defendants were directly involved in creating and/or overseeing Google's illegal,

25  anticompetitive hiring agreements and protocols, and were regularly updated regarding the same.

26  Publicly available information demonstrates Defendants' clear knowledge and involvement.

27

28
                                   VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### i.      Google and Apple

77.      Steve Jobs was one of the architects of the conspiracy because of his strong desire not to have his employees go to other firms.   In early 2005, Google and Apple agreed not to recruit certain of each other's employees.   The earliest publicly available documentation of this agreement are emails written by Defendant Brin about Jobs' threats against Google.   Jobs thought that Google was trying to recruit the team working on Apple's Safari browser.   On February 13, 2005, Defendant Brin memorialized in an email that Jobs "made various veiled threats."

78.      On February 17, 2005, Jobs telephoned Defendant Brin again with threats and, as a result, Defendant Brin agreed to stop recruiting from Apple.   Jobs' message, as noted in an email from Defendant Brin, could not have been more clear.   Defendant Brin understood after his call with an "irate" Jobs, that his position was "if you hire a single one of these people that means war."   Defendant Brin took this threat seriously and advised the Executive Management Group not to "make any new offers or contact new people at Apple until we have had a chance to discuss."

79.      To ensure its employees complied with the agreement, Google placed Apple on its internal "Do Not Call" list, which instructed Google employees not to cold call Apple employees.   Apple also informed its relevant personnel about its agreement with Google and instructed them not to cold call Google employees.   Senior executives of both companies monitored compliance with the agreement and policed violations.

80.      On February 27, 2005, non-party Campbell, a member of Apple's Board of Directors, a Senior Advisor at Google, and mentor to Defendant Schmidt, emailed Jobs to assure him that Defendant Schmidt "got directly involved and firmly stopped all efforts to recruit anyone from Apple."   The next day, an Apple internal memorandum to all of its recruiters in the United States reflects that Apple and Google agreed not to recruit each other's employees.

81.      Defendants put the agreement with Apple into an official company policy at least by early March 2005.   A Google internal memorandum lists Apple as a company having a

special agreement with Google and that is part of the "Do Not Call" list, effective March 6, 2005. Google's protocol was "[n]ot to directly cold call into" companies on this list.  Google's first anticompetitive agreements came on the heels of Jobs' threat to Defendant Brin to stop all recruiting at Apple.  Google expanded the scope of its anti-competitive conspiracy by adding Intel, Intuit, and eBay to Google's "Do Not Cold Call" list, though their effective dates were not until the following year.

82.     In a February 13, 2006 email from Apple's Jobs to Defendant Schmidt, Jobs complained, "I am told that Googles [sic] new cell phone software group is relentlessly recruiting in our iPod group.  If this is indeed true, can you put a stop to it?"  On the same day, Defendant Schmidt deferentially replied, "I'm sorry to hear this; we have a policy of no recruiting of Apple employees.  I will investigate immediately!"

83.     Then, in a March 7, 2007 email from Jobs to Defendant Schmidt, Jobs again protested about Google's suspected violations of its anticompetitive non-solicitation agreement with Apple: "Eric [Schmidt], I would be very pleased if your recruiting department would stop doing this," referring to an email from a recruiter for the Google.com Engineering team.

84.     In response, Defendant Schmidt emailed Defendant Geshuri the next day, telling him to "get this stopped and let me know why this is happening?  I will need to send a response back to Apple quickly so please let me know as soon as you can."  Defendant Geshuri replied to defendant Schmidt, reporting:

> On this specific case, the sourcer who contacted this Apple employee should not have and will be terminated within the hour . . .  In general, we have a very clear "do not call" policy that is given to every staffing professional and I reiterate this message in ongoing communications and staff meetings . . . for this type of violation we terminate [the employee's] relationship with Google.  Please extend my apologies as appropriate to Steve Jobs.  This was an isolated incident and we will be very careful to make sure this does not happen again.

85.     Defendant Schmidt responded to Defendant Geshuri stating, "[a]ppropriate response.  Please make a public example of this termination with the group.  Please also make it a very strong part of the new hire training for the group."  Defendants Schmidt's and Geshuri's immediate handling of Jobs' request demonstrates that they were far more concerned with

1   enforcing these anticompetitive agreements and maintaining good relations with Apple than with

2   preserving competition in Silicon Valley.

3       86.     An internal Apple email from 2009 reveals that the anticompetitive non-

4   solicitation agreements were mutual and ongoing.  Google appeared on Apple's "Hands Off (Do

5   Not Call List)," which was circulated between Apple employees.

6                                ii.     **Google and Intel**

7       87.     By no later than September 2007, Google had entered into an agreement with

8   Intel that was similar or identical to Google's agreement with Apple to stop recruiting employees

9   from each other.  Senior executives at Google and Intel expressly agreed, through direct

10  communications, not to cold call each other's employees.  Google's internal memorandum from

11  March 2006 lists Intel as a company having a special agreement with Google that was part of the

12  "Do Not Call" list since March 6, 2005.  Thus, Google's protocol was "[n]ot to directly cold call

13  into" Intel.  Similarly, Intel instructed its human resources staff about the existence of the

14  agreement.

15      88.     Senior executives of Google and Intel monitored compliance with the

16  anticompetitive non-solicitation agreements and policed violations.  For example, Google had

17  extended an offer to an Intel employee.  Upon learning of this, Defendant Rosenberg informed

18  Laszlo Bock ("Bock"), Senior Vice President of Google's People Operations in charge of all

19  hiring, in August 2006 that "[Bill] Campbell and I already discussed this and agreed that either

20  way I should give a call to [Defendant] Paul Otellini [Intel's then-CEO and President].  I'm

21  meeting with [the Intel employee] tomorrow and I will ask him how he wants to handle

22  communication to Intel management before we even get to the stage of specifically discussing an

23  offer."  Defendant Rosenberg's email demonstrates how important the unlawful non-solicitation

24  agreements were to Google's executive team.

25      89.     In an April 2007 email, Defendant Otellini noted the existence of the

26  anticompetitive agreement between Google and Intel.  Defendant Otellini wrote that he was

27

28

"worried that [Google] would try to raid [Intel]" to fill two senior management positions. However, he also stated, "I have an unofficial no poaching policy with [Google]."

90. In a June 3, 2007 email to Defendant Brown and Bock, Defendant Schmidt inquired about Google's policy regarding hiring Intel employees. Schmidt informed them, "Since [Defendant] Paul [Otellini] is on [Google's] board we should have a crisp rule." Defendant Otellini was also the CEO and President of Intel, and a member of its Board of Directors at that time. Defendant Geshuri replied, "Since the beginning of the Do Not Call List, Intel has been listed. No one calls, networks, or emails into the company or its subsidiaries looking for people." Defendant Schmidt then relayed Defendant Geshuri's response to Defendant Otellini. It seems that Defendant Otellini asked Defendant Schmidt about Google's policy regarding hiring Intel employees after a suspected violation. Defendant Schmidt added, "Hopefully there are no exceptions to this policy and if you become aware of this please let me know immediately!" Defendant Otellini forwarded Defendant Schmidt's email to Intel personnel, stating, "Fyi . . . Do not fwd."

91. In a September 6, 2007 email, Defendant Otellini clarified Intel's relationship with Google to Intel personnel with the subject "global gentleman agreement with Google": "[Google and Intel] have nothing signed. We have a handshake 'no recruit' between eric [Schmidt] and myself. I would not like this broadly known."

92. Despite this illegal, anticompetitive agreement between Google and Intel at this time, Renee James of Intel emailed Defendant Otellini on September 26, 2007, demonstrating Google was losing the opportunity to hire the best employees in stating, "I am losing so many people to Google." Defendant Otellini then emailed Defendant Schmidt, asking, "Eric [Schmidt], can you pls [sic] help here??? Renee runs all my s/w efforts." Defendant Schmidt replied, assuring Defendant Otellini that Google does not actively recruit from Intel. He added, Defendant "Arnnon [Geshuri] will run the diligence and report back to you on the facts. If we find that a recruiter called into Intel, we will terminate the recruiter. We take these relationships exceptionally seriously." Moreover, he wrote, Google will "develop and implement a process to

1    actively flag candidates from sensitive companies as soon as they receive a response to

2    their Google application."

3                              **iii.    Google and Intuit**

4          93.    By June 2007, Google had entered into an agreement with Intuit that was nearly

5    identical to Google's agreements with Apple and Intel.  Google and Intuit agreed to eliminate

6    competition between them for skilled labor, designed to suppress the compensation and mobility

7    of each company's employees.  Senior executives from these two companies expressly agreed,

8    through direct communications, not to cold call each other's employees.  Like the agreements

9    with Apple and Intel, the Google internal memorandum from March 2006 lists Intuit as a

10   company having a special agreement with Google that is part of the "Do Not Call" list, effective

11   April 10, 2006; Google's protocol was "[n]ot to directly cold call into" companies on this list.

12   However, instead of the entire company, the memorandum lists eighteen specific individuals at

13   Intuit to avoid contacting.  This agreement was later amended to include Intuit on the general

14   "Do Not Call" list.

15         94.    On June 5, 2007, Defendant Geshuri sent an email to Google employees

16   requesting that the Do Not Call list "now include Intuit 100% do not call" instead of only the

17   original eighteen named employees.  The next day, Defendant Geshuri emailed Defendant

18   Schmidt, copying Defendant Brown, informing them that Campbell, Chairman of Intuit's board

19   and a member of Apple's board, "requested that Intuit be added fully to the Do Not Call list . . .

20   Please confirm that you are okay with the modification to the policy."

21         95.    To ensure compliance with the non-solicitation agreement, Google added Intuit

22   on its "Do Not Call" and "Sensitive" company list, and instructed Google employees not to cold

23   call Intuit employees.  This was included on an email titled "Arnnon's Top 10."

24         96.    Senior Google and Intuit executives monitored compliance with the agreement

25   and policed violations.  For example, Egon Zehnder International ("Egon Zehnder"), a leading

26   executive search firm, emailed an Intuit employee on November 18, 2005, regarding a search it

27   was conducting on behalf of Google for the newly created role of Chief Marketing Officer.  The

28

1  very next day, Campbell asked Defendant Rosenberg, "[a]re you guys nuts?" after coming across

2  Egon Zehnder's email to the Intuit employee.  Campbell was then Google's Senior Advisor and

3  Chairman of Intuit's Board of Directors.  Defendant Brown then emailed Martha Josephson of

4  Egon Zehnder regarding the email, stating, "This is pretty bad.  Can you educate your colleagues

5  please."

6        97.    On February 13, 2007, Campbell again emailed Bock copying Defendant Brown,

7  requesting, "Can we please not target Intuit . . ." with respect to an Intuit employee who had

8  reached out to Google.  Bock emphasized that Intuit was on "Google's do not solicit" list.  Bock

9  added, "[T]here are a lot of fish in the sea and I'm happy to not move forward with conversations

10  with this particular individual if you prefer."

11        98.    The companies in the unlawful cartel also assisted each other in forming and

12  policing their agreement.  Campbell's February 18, 2006 email to Jobs mentioned a conversation

13  he had with Defendant Schmidt.  "I am heading out of town . . . and wanted to give you the latest

14  of what I heard from Google after talking to Eric Schmidt.  [] Eric told me he got directly

15  involved and firmly stopped all efforts to recruit anyone from Apple."

16                              **iv.    Google and Dell**

17        99.    By April 2007, Google entered into a non-solicitation agreement with Dell after

18  Michael Dell ("M. Dell"), Dell's CEO and founder, emailed Defendant Schmidt to express his

19  displeasure about "Google extend[ing] an offer to one of [Dell]'s sales guys . . . given our

20  partnership."  M. Dell suggested that the companies "have a general understanding that we are

21  not actively recruiting from each other."

22        100.   Shortly thereafter, Defendant Schmidt forwarded M. Dell's email to two of

23  Google's human resources executives.  Bock stated that Google would "put Dell on 'do not call'

24  for the next 2 months."

25                              **v.    Google and eBay**

26        101.   In September 2005, Google entered into a non-solicitation agreement with eBay

27  after eBay CEO Margaret C. Whitman ("Whitman") telephoned Defendant Schmidt complaining

28

1  that Google's recruiters were hurting profits and business at eBay.  Defendant Schmidt

2  subsequently emailed Google's Executive Management Group summarizing Whitman's and

3  "The valley's" view that competing for workers by offering higher pay packages was "unfair."

4  Defendant Schmidt told a Google executive to "fire the recruiter [who offended Whitman]

5  immediately" because she was a "good friend."  Soon after Whitman's call to Defendant

6  Schmidt, Google listed eBay under "Sensitive" companies.

7  102.    In early October 2005, Defendant Brown, then-Google's Senior Vice President of

8  Human Resources, emailed Defendant Schmidt a draft list of companies on the Company's "Do

9  Not Call" and "Sensitive" lists, and the policy protocols.  Defendant Schmidt replied, "This

10  looks very good."  Defendant Brown then asked Defendant Schmidt if Defendant Kordestani,

11  then Google's Senior Vice President of Global Sales and Business Development, could share

12  "with Ebay/[PayPal] the rules as they pertain to them?"  Defendant Schmidt replied, "I would

13  prefer that Omid [Kordestani] do it verbally."  He even voiced concern regarding "a paper trail

14  over which we can be sued later."

15  ### C.    Specific Documentation of Defendants' Misconduct at Google

16  103.    On October 4, 2005, an email explaining the illegal, anticompetitive hiring policy

17  was sent to many senior Google employees and directors, including Defendants Page, Brin,

18  Schmidt, and Brown.  The email contained a list of companies that Google had reached an

19  agreement with, including both "Do Not Cold Call" companies and "Sensitive" companies.  The

20  email further requested feedback from Google's top executives and directors concerning the

21  stated policies and protocols for each type of company.

22  104.    Defendant Schmidt expressly agreed to the illegal policy referenced in the

23  October 4, 2005 email, responding that it "looks very good."  Defendants Page and Brin tacitly

24  approved of the policy by not responding thereto.

25  105.    In an October 5, 2005 follow up email to the above email, Defendant Brown

26  asked Defendant Schmidt if he was at all concerned with sharing the anticompetitive protocol

27  between Google and eBay, and Google and PayPal.  Defendant Schmidt replied that he "would

28

1  prefer that [the information was shared] verbally since I don't want to create a paper trail over

2  which we can be sued later?"  Defendant Brown agreed that it "makes sense to do orally."

3      106.   Non-party Campbell emailed Defendant Rosenberg in November 2005, asking,

4  "Jonathan . . .  Are you guys nuts?  Bill," referring to an email Egon Zehnder International

5  ("Egon Zehnder"), an executive search firm, sent to an Intuit employee on behalf Google.  Egon

6  Zehnder was conducting a search for Google's newly created role of Chief Marketing Officer.

7  Defendant Rosenberg did not reply, but is copied on a subsequent email (along with Campbell)

8  from Defendant Brown – Senior VP of Google's Human Resources at the time, to Egon Zehnder,

9  in which she admonishes the firm for the solicitation email.

10      107.   In an email string from April and May 2006, Defendants Page, Brin, and Eustace

11  were all aware that Google had decided not to hire certain individuals because doing so would

12  risk Google's relationship with Apple.  In April 2006, Defendant Eustace emailed Jobs to ask if

13  he would have an issue with Google hiring a former Apple employee.  Jobs responded that he

14  "would have a problem if [what the employee is working on] is related to cell phone handsets,

15  etc."  After Defendant Eustace replied that it would not be "anything having to do with cell

16  phone handsets," Jobs responded "[t]hat would be fine with me."  Defendant Eustace then asked

17  Jobs for approval because that employee wanted "to hire 4 people that used to work for him at

18  Apple in Paris.  Three left in [sic] Apple in December, and one gave notice in December…."

19  Defendant Eustace went so far as to write to Jobs, "Are you OK with this?  ***If not, I'm willing to***

20  ***cancel the entire thing.***"  (Emphasis added.)  Jobs responded, "[w]e'd strongly prefer that you

21  not hire these guys."  Thus, based entirely on Jobs' "strong preference that [Google] not hire the

22  ex-Apple engineers," Defendant Eustace informed Jobs that "Jean-Marie [the employee

23  requesting to hire the additional four ex-Apple employees] and I decided not to open a Google

24  Paris engineering center."  On May 23, 2006, Defendant Eustace forwarded this email string

25  along to Defendants Page and Brin, and non-party Campbell.

26      108.   Defendant Rosenberg also enforced Google's illegal agreements.  For example, in

27  August 2006, Google was about to extend a job offer to an Intel employee when Defendant

28

1  Rosenberg informed Bock that "[Bill] Campbell and I already discussed this and agreed that

2  either way I should give a call to Paul Otellini. I'm meeting with [redacted (likely, the Intel

3  employee)] tomorrow and I will ask him how he wants to handle communication to Intel

4  management before we even get to the stage of specifically discussing an offer."

5      109. Another Google internal memorandum, dated November 2006, and entitled

6  "Special Agreement Hiring Policy Protocol for 'Restricted Hiring,' 'Do Not Cold Call,' and

7  'Sensitive' Companies" provided detailed instructions for dealing with employees from each of

8  these lists. The policy noted that Microsoft Corp., Novell Inc. ("Novell"), Oracle Corp., and Sun

9  Microsystems, Inc. ("Sun Microsystems") were on the "Restricted Hiring" list, which meant that

10  Google had agreed "not to pursue manager level and above candidates for Product, Sales, or

11  G&A roles – even if they have applied to Google."

12      110. Defendant Rosenberg received an email from a Google employee, Andrea Ritzer,

13  in January 2007, stating, "[i]t will be very challenging to add new initiatives [without] losing

14  something out the other end. I'm trying to be creative [with] recruiting from within the

15  [organization] . . . but we need to start poaching from other companies which is not that

16  something we currently do." Defendant Rosenberg was therefore aware of the hiring difficulties

17  caused by Google's non-solicitation agreements with other companies.

18      111. Defendant Schmidt and non-party Campbell also worked closely with Jobs to

19  enforce the terms of the agreement. On March 7, 2007, Jobs emailed Defendant Schmidt to

20  inform him about an attempt by a Google employee to recruit an Apple engineer, stating, "I

21  would be very pleased if your recruiting department would stop doing this." Defendant Schmidt

22  forwarded Jobs' email to undisclosed recipients and asked, "[c]an you get this stopped and let me

23  know why this is happening?" Google's staffing director responded that the employee who

24  contacted the Apple engineer "will be terminated within the hour." Defendant Brown added:

25        Appropriate response. Please make a public example of this termination with the
      group. ***Please also make it a very strong part of new hire training for the group.***

26        ***I want it clear that we have a zero-tolerance policy for violating our policies.***
      This should (hopefully) prevent future occurrences.

27  (Emphasis added.)

28

112.    Defendant Otellini sought to ensure that the "no recruit" policies were followed at Google.   On September 26, 2007, he received an email from an Intel executive stating that Google was selectively hiring certain people at Intel.   Defendant Otellini forwarded the email to Defendant Schmidt and asked, "Eric [Schmidt], can you [please] help here???"   Defendant Schmidt forwarded the email to other executives at Google, noting that he was under the impression that Google was not hiring from Intel, and requesting an investigation.   In response, Defendant Schmidt was assured that Google's policy was to not actively recruit from Intel, but if the investigation "find[s] that a recruiter called into Intel, we will terminate the recruiter."   The email also assured Defendant Schmidt that Google "take[s] these relationships exceptionally seriously."   Defendant Geshuri told Defendant Schmidt that the Google recruiters "are strictly following the Do Not Call policy regarding Intel and no one has called, networked, or emailed into the company or its subsidiaries looking for talent."

113.    For most of Google's co-conspirators, no publicly available documents detailing the negotiations leading up to the illegal agreements exist.   The lack of records is not surprising, since Defendants knew of the impropriety of such agreements.   Nevertheless, documents have recently surfaced that demonstrate how simple it was for Defendants to create the anticompetitive agreements with Google's competitors.   For example, Dell was added to Google's "Do Not Cold Call" list pursuant to a short email request from M. Dell, the Founder, Chief Executive Officer, and Chairman of Dell, to Defendant Schmidt.   M. Dell emailed Defendant Schmidt to develop a "general understanding that we are not actively recruiting from each other."   Defendant Schmidt forwarded the email to other members of the Executive Management Group, and instructed them to "put [Dell] on the 'don't call into Dell' list for a while."   Presumably, the details of the agreement were reached orally between Defendant Schmidt and M. Dell.

114.    Defendant Geshuri created Google's formal "Do Not Call" list, and was the link between Defendant Schmidt and Google's recruiters in implementing the illegal scheme. Defendant Geshuri enforced the agreement by having anyone who contacted an Apple employee

1   terminated.  Defendant Geshuri explained Google's policy with respect to Apple to Defendant

2   Eustace in an email dated February 11, 2008.  Defendant Eustace asked, "What is the policy

3   toward recruiting from Apple?"  Defendant Geshuri responded, "Apple is on our Do Not Call list

4   which basically means we cannot proactively go after anyone from the company.  We are not

5   allowed to call, email, or network directly into Apple to find passive candidates."

6       115.   Google's scheme to restrict competitive hiring stretched across many of Silicon

7   Valley's most powerful and influential companies.  Recently revealed documents demonstrate

8   the extent of these agreements with companies including Apple, Intel, Intuit, eBay, and Dell.

9       116.   In testimony from a March 18, 2013 deposition, Defendant Brin indicated that the

10   entire Google Board of Directors knew of these agreements, stating:

11      We felt that we should think, you know, are there other companies [besides
        Apple] where we also don't wish to, you know, needlessly aggravate the
12      executives, and I believe that Genentech was an example, and [Former Director
        Defendant] Art Levinson was on our board, and so was Intel, and [Director
13      Defendant] Paul Otellini was on our board.  **So I'm sure that we would have
        mentioned it to at least those board members, probably might as well the whole
14      board.**

15   (Emphasis added.)

16      117.   Even though Defendants had clear knowledge these anticompetitive hiring

17   agreements and protocols were illegal, Defendants caused and/or blindly permitted Google to

18   enter into "Do Not Cold Call" agreements with at least ten companies, and "Sensitive"

19   agreements with at least eight companies.  In particular, per Google's internal documents, in or

20   about March 2005, Google entered into "Do Not Cold Call" agreements with Genentech, Intel,

21   Apple, PayPal, and Comcast Corporation ("Comcast").   By January 2006, Google added

22   OpenTV Corp. ("OpenTV") and NVIDIA ("NVIDIA") Corporation to the "Do Not Cold Call"

23   list, and Intuit was added in April 2006, followed by eBay in November 2006, and Dell Inc.

24   ("Dell") in April 2007.  eBay was also on the "Sensitive" companies list at some point, along

25   with AOL Inc., Ask Jeeves, Inc., EarthLink, Inc., NTL, Clear Channel Communications, Inc.,

26   International Business Machines Corporation, and Lycos Inc.

27

28

118.    The illegal collusion between Google and its competitors was easy to accomplish because many of the Defendants had roles at both Google and other companies that engaged in the anticompetitive misconduct.

119.    For example, Defendant Otellini, in addition to his role at Google, also served on the Intel Board of Directors, as well as Intel's Chief Executive Officer between May 2005 and May 2013 – during the entirety of the misconduct alleged herein.

120.    Defendant Otellini played a key role in generating the anticompetitive hiring agreement between Google and Intel.  For example, in a September 6, 2007 email exchange between Defendant Otellini and other Intel employees, bearing the subject line "global gentleman agreement with Google," Defendant Otellini was asked if he knew of any "agreement with Google that prohibits [Intel] from recruiting Google's senior talent."  Defendant Otellini responded, "[l]et me clarify.  We have nothing signed.  We have a handshake 'no recruit' between eric [Defendant Schmidt] and myself.  I would not like this broadly known."

121.    When Google and Apple reached their anticompetitive agreement, Defendant Schmidt was also a director on Apple's Board, as was non-party Campbell, who was a senior advisor at Google and a director on Apple's Board.

122.    Google's anticompetitive agreements with other companies were so pervasive that they were not limited by geography (extending beyond Silicon Valley), job function, product group, or time period.  For  example, Sunni Paik, Google's Asia Pacific Leadership  Recruiter, emailed Defendant Geshuri, Google's Director of Recruiting, to confirm whether they could "cold call companies in Korea (excluding the 'do not cold call' companies, of course)," seeking to "check" and "get your approval" from Defendant Geshuri.

123.    Similarly, an email between Apple employees discussing applicants for a "sous chef" position shed light on the extent of the agreement between Google and Apple.  The email notes that Apple had received several resumes from Google employees, but that "[w]e are not recruiting these folks, they are actively seeking us out."  The Apple employees discussed the "sensitivity" issue, and one noted that "she gets it loud & clear."  The email further noted that the

1    Apple employee had "heard some rumblings the last couple of months that Google may not

2    necessarily be honoring their part of the hands-off policy, although I don't have any hard

3    evidence."

4         124.    Remarkably, Defendants even put their anticompetitive agreements with other

5    companies into official company memoranda.  In one memorandum entitled "Special Agreement

6    Hiring Policy Protocol for 'Do Not Cold Call' and 'Sensitive' Companies," Google listed the

7    companies that were part of its arrangement.   This memorandum noted that more and more

8    companies were being added to the agreement over time.  It provided specific instructions for the

9    companies included on the "Do Not Cold Call" list, which included Genentech, Intel, Apple,

10   PayPal, Comcast, OpenTV, NVIDIA, Intuit, and eBay.  For each of these companies, Google

11   employees were warned that they were "[n]ot to directly cold call into those companies."

12        125.    Google's policy also set forth specific restrictions for companies on their

13   "Sensitive" list.  Google's protocol was to provide notice to the Executive Management Group of

14   companies on this list when it was recruiting or extending an offer to their employees at the

15   director level or higher.   Ironically, the policy solidifying the anticompetitive agreement

16   informed employees to "[p]lease be cautious when recruiting teams from any company to keep

17   our candidates and potential employees safe from legal action."  Furthermore, the policy also

18   noted the pervasive nature of these anticompetitive agreements, stating that "[m]ost companies

19   have non-solicit agreements which would limit or prohibit a candidate from asking a coworker to

20   interview with us as well."

21        126.    The anticompetitive policies fostered at Google were so strong that Google

22   actually refrained from establishing a new division because it was Steve Jobs' "strong

23   preference" that they not hire certain individuals.   Google entered into anticompetitive

24   agreements with companies they deemed "Sensitive."   For "Sensitive" companies, hiring

25   restrictions applied to director level or higher candidates whom Google engaged and had begun

26   to interview.  For each company on the "Sensitive" list, Google staffing was required to inform

27   Google's Executive Management Group.   The Executive Management Group would then

28

designate a senior executive to either place a "courtesy call" to the "Sensitive" company when an offer was extended, or for certain undisclosed exceptions, call into the "Sensitive" company to indicate that Google was making an offer. The latter scenario allowed Google and its co-conspirators to restrict offers to certain employees that the colluding companies' executives had orally agreed not to poach and ensure that the offered salaries for such individuals did not exceed certain artificially deflated thresholds that were agreed upon between the companies. This allowed the companies to give the appearance that they had not entered into the illegal covenants, when they in fact had.

### D. The DOJ Investigation

127. In 2009, the DOJ began investigation of Silicon Valley's anticompetitive hiring practices. On September 24, 2010, the DOJ filed a complaint against Google, Adobe, Apple, Intel, Intuit, and Pixar, alleging that these companies' secretive agreements amounted to restraints of trade that were *per se* unlawful under the antitrust laws. The DOJ alleged that the agreements "are facially anticompetitive because they eliminated a significant form of competition to attract high tech employees, and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities." The DOJ further alleged that the agreements "disrupted the normal price-setting mechanisms that apply in the labor setting." The DOJ announced a settlement of the action on its website on September 24, 2010, though a final judgment in the action was not entered until March 17, 2011.

### E. Class Action Litigation Against Google and Its Competitors

128. On May 4, 2011, the first of several class actions was filed by employees of Google, Adobe, Apple, Intel, Intuit, Pixar, and other Silicon Valley companies that were investigated by the DOJ. These actions were consolidated in September 2011 in the United States District Court for the Northern District of California, and sought injunctive relief and damages for violations of: Section 1 of the Sherman Act, 15 U.S.C. §1; the Cartwright Act;

California Business and Professions Code §§16720, *et seq.*; California Business and Professions Code §16600; and California Business and Professions Code §§17200, *et seq.*

129.   On January 27, 2012, the parties filed an unredacted Joint Case Management Conference Statement ("CMC Statement").  The CMC Statement selectively quoted the contents of certain internal documents from Intel and other companies that were uncovered in discovery in the Antitrust Class Action.  This was the first time the public learned about the extent of the anticompetitive practices detailed herein, and that they were the result of "gentleman's agreements" between the officers and directors of the companies involved in the collusive scheme, including Google.

130.   On April 18, 2012, the Court granted in part and denied in part the defendants' joint motion to dismiss the Antitrust Class Action.  The Court held that the federal enclave doctrine did not extinguish the claim for violation of California's Cartwright Act, and that the class action plaintiffs sufficiently alleged: the colluding companies' overarching conspiracy, as required to state a claim for Sherman Act violation; the colluding companies' knowledge of and intent to engage in conspiracy; and a *per se* violation of the Sherman Act.  *See generally In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1108 (N.D. Cal. 2012).  The Court further held that the class action plaintiffs had Article III standing to bring a restraint of trade claim and sufficiently alleged an antitrust injury, as required to bring a claim under the Sherman Act, but had no vested interest protected by California's Unfair Competition Law.  *See id.*

131.   On January 22, 2013, true copies of the documents quoted in the CMC Statement, along with certain other internal documents from Intel and others, were finally made public when they were attached as exhibits to the Declaration of Anne B. Shaver in Support of Plaintiffs' Notice of Motion and Motion for Class Certification, and Memorandum of Law in Support.

132.   On April 24, 2014, the remaining parties to the Antitrust Class Action (Google, Adobe, Apple, and Intel) informed the Court that they had reached an agreement to settle the Antitrust Class Action.  The settlement amount was $324.5 million.

133. However, on August 8, 2014, the Court denied the antitrust plaintiffs' motion for preliminary approval of settlements with Google, Adobe, Apple, and Intel. *See High-Tech Employee*, 2014 WL 3917126. At length, the Court highlighted the overwhelming evidence against Google demonstrating that it had engaged in anticompetitive behavior. *Id.,* at *9-*11. This includes, *inter alia*:

a. Defendant Schmidt terminated at least two recruiters for violations of anti-solicitation agreements, and threatened to terminate more;

b. Defendant Schmidt informed Defendant Otellini that Defendant Schmidt would terminate any Google recruiter who recruited Intel employees;

c. Google maintained a formal "Do Not Call" list, which was approved by top Google executives;

d. A draft of the "Do Not Call" list was presented to Google's Executive Management Group, which consisted of Defendants Schmidt, Page, Brin, and Brown, among other senior Google executives;

e. Defendant Schmidt approved Google's "Do Not Call" list;

f. Google executives knew that the anti-solicitation agreements could lead to legal troubles;

g. Defendant Schmidt told Defendant Brown that he preferred the "Do Not Call" list to only be shared "verbally . . . since I don't want to create a paper trail over which we can be sued later?"; (*id.*, at *9) and

h. Defendant Geshuri, upon learning that Facebook was cold calling Google's employees, responded by suggesting that Google contact Facebook's Chief Operating Officer to consider establishing a mutual "Do Not Call" agreement.

134. The Court ultimately rejected the settlement in the Antitrust Class Action because "there is ample evidence of an overarching conspiracy between" Google and the other defendants, and of "evidence of Defendants' rigid wage structures and internal equity concerns,

1   along with statements from Defendants' own executives, are likely to prove compelling in

2   establishing the impact of the anti-solicitation agreements . . . ."  *Id.,* at *16.  The Court

3   concluded that the settlement amount of $324.5 million was too low.  *Id.,* at *17.

4       135.    In response, on January 15, 2015, Google, Adobe, Apple, and Intel, as well as the

5   Antitrust Class Action plaintiffs, filed a new motion for preliminary approval of the settlement.

6   This time, the purported settlement would pay the Antitrust Class Action plaintiffs $415 million.

7       136.    On March 3, 2015, Judge Koh granted preliminary approval to the new $415

8   million settlement in the Antitrust Class Action.  After the parties to the Antitrust Class Action

9   submit additional briefing and Class members are given an opportunity to object, the Court will

10  hold a final approval hearing regarding the new $415 million settlement on July 9, 2015.

11          **F.**    **Defendants' Misconduct Has Caused Google Significant Harm**

12      137.    As a result of Defendants' breach of their fiduciary duties, Google entered into

13  anticompetitive hiring agreements with several of the Company's peers.  These agreements

14  restricted employee mobility and artificially decreased the wages of over 100,000 employees in

15  Silicon Valley.

16      138.    In September 2010, Google was forced to enter into a five-year settlement

17  agreement with the DOJ to remedy the Company's illegal anticompetitive agreements with its

18  co-conspirators.  The DOJ alleged that Google's non-solicitation agreements amounted to

19  restraints of trade that were *per se* unlawful under the federal antitrust laws.  The DOJ

20  determined that the agreements are "facially anticompetitive because they eliminated a

21  significant form of competition to attract high tech employees, and, overall, substantially

22  diminished competition to the detriment of the affected employees who were likely deprived of

23  competitively important information and access to better job opportunities."  A final judgment in

24  the DOJ action against Google was entered on March 17, 2011.  Under this settlement, Google

25  was required to cease entering into these anticompetitive agreements, annually file a statement

26  describing any violations, and allow the DOJ to access Google's offices and to interview

27  Google's executives employees to ensure compliance with the settlement.  Notably, within sixty

28

days of entry of the final judgment, and for each of the succeeding five years, each director of Google must certify that (s)he had read the Final Judgment, understood it, was not aware of any violation of the Final Judgment, and understood that any "person's failure to comply with this Final Judgment may result in an enforcement action for civil or criminal contempt of court against [Google] and/or any person who violates this Final Judgment." *United States v. Adobe Systems, Inc.*, No. 10-cv-1629, ECF No. 17, §VI.A.4 (D.D.C. Mar. 18, 2011) Google sustained significant harm from the DOJ investigation and settlement, both in terms of reputation and the expenditure of substantial time and money to defend itself, and it will continue to have to expend money to comply with its settlement with the DOJ.

139. Furthermore, as alleged herein, Google has also been sued in a class action brought by Silicon Valley employees for antitrust and other violations alleging that their wages have been suppressed, which has been settled, but the Court has yet to approve the settlement. The Antitrust Class Action, which was initially filed against six companies, seeks billions of dollars in damages against all the defendants.  A class was certified and trial was scheduled for May of 2014.  Presently, Google's agreement to pay part of a $415 million settlement awaits Court approval.  Google has had to expend substantial time and money to defend itself and will have to spend more time and money to satisfy the settlement.

140. Google's reputation has been harmed as a result of these anticompetitive agreements.

141. Further harm has come from the loss of innovation which occurred because of the anticompetitive agreements.  Alan Hyde, a Professor and a Sidney Reitman Scholar at Rutgers University School of Law and author of *Working in Silicon Valley: Economic and Legal Analysis of a High-Velocity Labor Market*, concluded that technological and economic growth depends upon a company's ability to hire and fire employees quickly in his theory of damages.  Professor Hyde addresses the evolving labor market by utilizing the high-technology employers in Silicon Valley as a case study.  Professor Hyde declares that the rapid and  frequent turnover of employees is a key component resulting in short job tenures.  He also identifies the heavy use of

1   temporary labor and a lack of loyalty to individual firms as contributing factors.  Professor Hyde

2   labels these unique components of employment in the mobile market of Silicon Valley as "high-

3   velocity."  In an attempt to explain why high-velocity labor supports rapid technological growth,

4   Professor Hyde effectively identifies and explains two general concepts, "flexibility" and

5   "information diffusion."  "Flexibility" accounts for the fluid market of available employees

6   consisting of contractors and consultants who typically move from one company to the next.

7   "Information diffusion" accounts for the technical know-how and advancements that travel

8   between companies as those employees move from job to job.[6]

9       142.   Thus, Defendants impeded technological and economic growth at Google by

10  entering into non-solicitation agreements with the Company's competitors to artificially freeze

11  employee salaries at Google and at other companies, which suppressed high-velocity labor by

12  squelching flexibility and information diffusion.  The anticompetitive agreements run contrary to

13  what has made Silicon Valley so successful: job-hopping.  As Professor Hyde explains, "[t]here

14  is a fair amount of research that tech companies, particularly in California, have distinctive

15  personnel practices."  He stated, "[t]hey hire for short tenures and keep ties with former

16  employees so there can be an exchange of information across company lines.  The companies in

17  [a class-action lawsuit that accuses industry executives of agreeing between 2005 and 2009 not

18  to poach one another's employee] might have been killing the golden goose."[7]

19      143.   This loss has been confirmed by Google internal documents.  Prior to Google's

20  agreement with Apple, Google determined it needed to "dramatically increase the drain to

21  competitors to accomplish this rate of hiring [employees for positions in the technical class]."

22  There was a large "hiring gap" for engineering positions.  Google found that cold calling offered

23  the highest yield of employees.  In response to concerns about slow hiring, Google's Chief

24

25  _____

26  [6]     ALAN HYDE, WORKING IN SILICON VALLEY: ECONOMIC AND LEGAL ANALYSIS OF A HIGH-VELOCITY LABOR MARKET (M.E. Sharpe, Inc. 2003).

27  [7]     David Streitfeld, Engineers Allege Hiring Collusion in Silicon Valley, *New York Times*, Feb. 28, 2014,
28  http://www.nytimes.com/2014/03/01/technology/engineers-allege-hiring-collusion-in-silicon-valley.html?_r=0.
    Visited May 2, 2014.

1    Culture Officer stated that: "Cold calling into companies to recruit is to be expected unless

2    they're on our 'don't call' list."  Google tracked the decline of its top technical candidates as well

3    as the loss of its technical employees.

4            144.    A January 8, 2007 email from Google personnel to Defendant Rosenberg reveals

5    how "it will be very challenging to add new initiatives [without] losing something out the other

6    end" due to the anticompetitive non-solicitation agreements in place between Google and other

7    competitors.  Further, he stated, "I'm trying to be creative [with] recruiting from within the

8    [organization] . . . but we need to start poaching from other companies which is not something

9    that we currently do."

10           145.    When Google removed eBay and PayPal from its "Do Not Call" list, this opened

11   the door for a flood of talent and therefore, innovation.  Defendant Geshuri's May 14, 2007

12   email to Defendant Schmidt stated, "[i]n response to the recent lifting of eBay and PayPal from

13   the 'do not call list,' staffing is ready to pursue several hundred leads and candidates from these

14   two companies for various roles within Google."

15           146.    Furthermore, as a direct and proximate result of Defendants' actions, Google has

16   expended, and will continue to expend, significant sums of money.  Such expenditures include,

17   but are not limited to: (a) costs incurred from years of lost opportunities to hire more qualified

18   employees who were employed at other companies; (b) costs incurred from defending and

19   eventually paying a settlement in the Antitrust Class Action for violations of antitrust laws;

20   (c) costs incurred from defending and settling the DOJ action against Google; (d) loss of

21   reputation; and (e) costs incurred from compensation and benefits paid to the Defendants who

22   have breached their duties to Google.

23   **VII.    DIRECTOR DEFENDANTS' CAMPAIGN FOR RETENTION WHILE**
     **WITHHOLDING MATERIAL INFORMATION FROM**
24   **SHAREHOLDERS**

25           147.    On May 9, 2012, several of the Director Defendants caused Google to issue a

26   false and misleading proxy statement in connection with the 2012 Annual Shareholders' meeting

27   that was held on June 21, 2012 (the "2012 Proxy"), at which Google's shareholders were to vote

28

1  on the election of the ten nominees for the Board listed in the proxy, including all of the Director

2  Defendants.

3       148.    In violation of Section 14(a) of the Exchange Act, the 2012 Proxy contained

4  materially false and misleading statements and omissions.

5       149.    The 2012 Proxy misleadingly represented that Google's Board of Directors

6  selected nominees for the Board who "are committed to maintaining the highest standards of

7  business conduct and corporate governance, which we believe are essential to running our

8  business efficiently, serving our stockholders well, and maintaining our integrity in the

9  marketplace.  We have adopted a code of business conduct and ethics for directors, officers

10  (including our principal executive officer and principal financial and accounting officer), and

11  employees, known as the Google Code of Conduct."

12       150.    As noted above, the Google Code of Conduct required Defendants, *inter alia*, to

13  preserve "[o]ur reputation as a company that our users can trust is our most valuable asset, and it

14  is up to all of us to make sure that we continually earn that trust.  All of our communications and

15  other interactions with our users should increase their trust in us."

16       151.    Furthermore, the Google Code of Conduct assured investors that Google and the

17  Defendants would "Obey the Law," including not violating antitrust, competition, or unfair

18  competition laws.

19       152.    These statements were false and misleading at the time they were made in the

20  absence of the disclosure that these Director Defendants (Page, Brin, Schmidt, Doerr, Greene,

21  Hennessy, Mather, Otellini, Shriram, and Tilghman) had exhibited a distinct lack of personal and

22  professional integrity by causing and/or allowing the Company to knowingly violate federal

23  antitrust laws.  These statements were material because there is a substantial likelihood that a

24  reasonable shareholder would consider them important in deciding how to vote.

25       153.    In addition, the 2012 Proxy misleadingly provides: "Our employees . . . are

26  everything.  Google is organized around the ability to attract and leverage the talent of

27  exceptional technologists and business people. . . .  In line with this philosophy, we have

28

1  designed our compensation programs to support three main goals: [a]ttract and retain the world's

2  best talent[; s]upport Google's culture of innovation and performance[; and a]lign employee and

3  stockholder interests."  This statement was false and/or misleading at the time it was made in the

4  absence of a disclosure that Google did not design such a compensation program but was

5  required by a settlement agreement with the DOJ to stop its compensation program that

6  suppressed wages or inhibited innovation.

7       154.  These false and misleading statements and omissions were an essential link in the

8  election of the Director Defendants to the Board of Directors of Google.  The 2012 Proxy

9  harmed Google by interfering with the proper governance on its behalf that follows the free and

10  informed exercise of the stockholders' right to vote for directors.  For example, as a result of the

11  false proxy statement's interference with fair corporate suffrage, the Director Defendants were

12  elected to the Board and continued to harm Google by causing and/or allowing the Company and

13  its employees to break the law.

14       155.  On April 24, 2013, several of the Director Defendants caused Google to issue a

15  false and misleading proxy statement in connection with the 2013 Annual Shareholders' meeting

16  that was held on June 6, 2013 (the "2013 Proxy"), at which Google's shareholders were to vote

17  on the election of the ten nominees for the Board listed in the proxy, including all of the Director

18  Defendants.

19       156.  In violation of Section 14(a) of the Exchange Act, the 2013 Proxy contained

20  materially false and misleading statements and omissions.

21       157.  The 2013 Proxy misleadingly represented that Google's Board of Directors

22  selected nominees for the Board must comply with the Google Code of Conduct.  Specifically,

23  the 2013 Proxy stated:

24           We have adopted a code of business conduct and ethics for directors, officers
         (including our principal executive officer and principal financial and accounting

25           officer), and employees, known as the Google Code of Conduct. We have also
         adopted Corporate Governance Guidelines, which, in conjunction with our

26           certificate of incorporation, bylaws, and charters of the standing committees of
         our board of directors, form the framework for our corporate governance.

27

28

158.   As noted above, the Google Code of Conduct required Defendants, *inter alia*, to preserve "[o]ur reputation as a company that our users can trust is our most valuable asset, and it is up to all of us to make sure that we continually earn that trust.  All of our communications and other interactions with our users should increase their trust in us."

159.   Furthermore, the Google Code of Conduct assured investors that Google and the Defendants would "Obey the Law," including not violating antitrust, competition, or unfair competition laws.

160.   This statement was false and misleading at the time it was made in the absence of the disclosure that these Director Defendants (Page, Brin, Schmidt, Doerr, Greene, Hennessy, Mather, Otellini, Shriram, and Tilghman) had exhibited a distinct lack of personal and professional integrity by causing and/or allowing the Company to knowingly violate federal antitrust laws. This statement was material because there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.

161.   In addition, the 2013 Proxy misleadingly provides: "Our employees . . . are everything.  Google is organized around the ability to attract and leverage the talent of exceptional technologists and business people. . . .  In line with this philosophy, we have designed our compensation programs to support three main goals: [a]ttract and retain the world's best talent[; s]upport Google's culture of innovation and performance[; and a]lign employee and stockholder interests."  This statement was false and/or misleading at the time it was made in the absence of a disclosure that Google did not design such a compensation program but was required by a settlement agreement with the DOJ to stop its compensation program that suppressed wages or inhibited innovation.

162.   Thus, an investor could not take comfort from the existence of the reporting structure described in the 2013 Proxy because Google's management and directors did not care if their employees broke the law.

163.   These false and misleading statements and omissions were an essential link in the election of the Director Defendants to the Board of Directors of Google.   The 2013 Proxy

1    harmed Google by interfering with the proper governance on its behalf that follows the free and

2    informed exercise of the stockholders' right to vote for directors.  For example, as a result of the

3    false proxy statement's interference with fair corporate suffrage, the Director Defendants were

4    elected to the Board and continued to harm Google by causing and/or allowing the Company and

5    its employees to break the law.

6         164.   On March 28, 2014, several of the Director Defendants caused Google to issue a

7    false and misleading proxy statement in connection with the 2014 Annual Shareholders' meeting

8    that was held on May 14, 2014 (the "2014 Proxy"), at which Google's shareholders were to vote

9    on the election of the ten nominees for the Board listed in the proxy, including all of the Director

10   Defendants.

11        165.   In violation of Section 14(a) of the Exchange Act, the 2014 Proxy contained

12   materially false and misleading statements and omissions.

13        166.   The 2014 Proxy misleadingly represented that Google's Board of Directors

14   selected nominees for the Board must comply with the Google Code of Conduct.  Specifically,

15   the 2014 Proxy stated:

16        We have adopted a code of business conduct and ethics for directors, officers
          (including our principal executive officer and principal financial and accounting
17        officer), and employees, known as the Google Code of Conduct.  We have also
          adopted Corporate Governance Guidelines, which, in conjunction with our
18        certificate of incorporation, bylaws, and charters of the standing committees of
          our board of directors, form the framework for our corporate governance.

19        167.   As noted above, the Google Code of Conduct required Defendants, *inter alia*, to

20   preserve "[o]ur reputation as a company that our users can trust is our most valuable asset, and it

21   is up to all of us to make sure that we continually earn that trust.  All of our communications and

22   other interactions with our users should increase their trust in us."

23        168.   Furthermore, the Google Code of Conduct assured investors that Google and the

24   Defendants would "Obey the Law," including not violating antitrust, competition, or unfair

25   competition laws.

26        169.   This statement was false and misleading at the time it was made in the absence of

27   the disclosure that these Director Defendants (Page, Brin, Schmidt, Doerr, Greene, Hennessy,

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Mather, Otellini, Shriram, and Tilghman) had exhibited a distinct lack of personal and

2   professional integrity by causing and/or allowing the Company to knowingly violate federal

3   antitrust laws. This statement was material because there is a substantial likelihood that a

4   reasonable shareholder would consider it important in deciding how to vote.

5          170.    In addition, the 2014 Proxy misleadingly provides: "Our employees . . . are

6   everything.  Google is organized around the ability to attract and leverage the talent of

7   exceptional technologists and business people. . . .  In line with this philosophy, we designed our

8   compensation programs for all Googlers, including named executive officers, to support three

9   main goals: [a]ttract and retain the world's best talent[; s]upport Google's culture of innovation

10  and performance[; and a]lign employee and stockholder interests."  This statement was false

11  and/or misleading at the time it was made in the absence of a disclosure that Google did not

12  design such a compensation program but was required by a settlement agreement with the DOJ

13  to stop its compensation program that suppressed wages or inhibited innovation.

14         171.    Thus, an investor could not take comfort from the existence of the reporting

15  structure described in the 2014 Proxy because Google's management and directors did not care if

16  their employees broke the law.

17         172.    These false and misleading statements and omissions were an essential link in the

18  election of the Director Defendants to the Board of Directors of Google.  The 2014 Proxy

19  harmed Google by interfering with the proper governance on its behalf that follows the free and

20  informed exercise of the stockholders' right to vote for directors.  For example, as a result of

21  their election to the Board, the Director Defendants continued to harm Google by causing and/or

22  allowing the Company and its employees to break the law.

23  **VIII.   THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFF'S**
           **CLAIMS, OR ALTERNATIVELY, THE STATUTE OF LIMITATIONS**
24         **WAS TOLLED**

25         173.    The statute of limitations does not bar Plaintiff's shareholder derivative action,

26  because Plaintiff has brought its action within the requisite time frame.

27

28

174.   In the alternative, the statute of limitations was tolled during the period of wrongdoing under the doctrines of fraudulent concealment and equitable tolling.

175.   "[T]he statute of limitations may be disregarded when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth. Under this doctrine, a plaintiff must allege an affirmative act of 'actual artifice' by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth." *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007).

176.   Defendants issued false and misleading proxy statements, including the 2014 Proxy issued on March 28, 2014.  In their public filings, the Director Defendants specifically stated that they and the Company were in compliance with all antitrust laws.  As alleged herein, however, this was false and misleading.  These misstatements are an act of "actual artifice" that satisfy the requirements of the doctrine of fraudulent concealment. *See, e.g., Tyson Foods*, 919 A.2d at 590.

177.   Furthermore, "[t]he equitable tolling doctrine . . . applies if the Stockholder Plaintiffs were actually lulled into repose by AIG's public filings."  *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 813 (Del. Ch. 2009).  The doctrine of equitable tolling "stops the statute [of limitations] from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary.  No evidence of actual concealment is necessary in such a case. . . ." *Tyson Foods*, 919 A.2d at 585.

178.   Again, Defendants issued false and misleading proxy statements, including the 2014 Proxy issued on March 28, 2014.   In their public filings, the Director Defendants specifically stated that they and the Company were in compliance with all antitrust laws.  These misstatements misled investors, who relied in good faith on these misstatements.  "To allow fiduciaries who engaged in illegal conduct to wield a limitations defense against stockholders who relied in good faith on those fiduciaries when their disclosures provided no fair inquiry notice of claims would be inequitable."  *In re Am. Int'l Grp.*, 965 A.2d at 813.

179.   Accordingly, the statute of limitations was tolled by virtue of the Director Defendants' false and misleading public statements.  Plaintiff did not discover, and could not have discovered, the liability of Defendants until the truth was fully revealed after the filing of the 2014 Proxy.  Thus, the doctrines of fraudulent concealment and equitable tolling prevent the statute of limitations from having run.

## IX.   DAMAGES ALLEGATIONS

180.   As a direct and proximate result of the Defendants' wrongdoing, Google has suffered, and will continue to suffer, a myriad of damages.

181.   Defendants' actions here, for example, caused Google to suffer reputational damages.

182.   Furthermore, Defendants' actions have caused the Company to be the subject of a high profile antitrust class action lawsuit, *In re High-Tech Employee Antitrust Litigation*, No. 11-cv-2509-LHK (N.D. Cal.).  Reportedly, the Company will attempt to settle this litigation for tens of millions – if not hundreds of million – dollars.

183.   In addition, Defendants, while causing and/or allowing the Company to violate the law, received lavish compensation.

184.   Furthermore, Defendants have caused the Company to expend tens of millions of dollars on attorneys' fees and costs in defending against the DOJ action and the Antitrust Class Action.

185.   By the terms of the Company's final judgment with the DOJ entered on March 17, 2011, each Google director, for each of the succeeding five years, must certify that (s)he has read the final judgment entered in that case, understands it, was not aware of any violation of the final judgment, and that any "person's failure to comply with the Final Judgment may result in an enforcement action for civil or criminal contempt of court against [Google] and/or any person who violates the" final judgment.  The DOJ settlement further requires Google to annually file a statement describing violations of the agreement, and to allow the DOJ to access Google's offices and to interview Google's executives and employees to ensure compliance with the

1   settlement.   As a result, Google has sustained and will continue to sustain ongoing costs in

2   compliance with the DOJ settlement.

3       186.   Finally, by virtue of the misconduct alleged herein, Google has lost out on many

4   of the best and brightest high-tech employees, thereby resulting in lost opportunities for

5   innovation in a company that is wholly dependent on such innovation.

6   **X.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

7       187.   Plaintiff was a shareholder at the time of the conduct complained of herein and

8   has continuously held shares of Google through the present.   Plaintiff will continue to remain a

9   shareholder of Google throughout the pendency of this action.   Plaintiff will adequately and

10  fairly represent the interests of Google and its shareholders in enforcing its rights.

11      188.   Plaintiff repeats, realleges, and incorporates by reference each and every

12  allegation set forth as though fully set forth herein.   In addition to those allegations, demand on

13  the current Board of Directors (comprised of Defendants Larry Page, Sergey Brin, Eric E.

14  Schmidt, L. John Doerr, Diane B. Greene, John L. Hennessy, Ann Mather, Paul S. Otellini, K.

15  Ram Shriram, Shirley M. Tilghman, and non-defendant Alan R. Mulally) would have been a

16  futile act for at least the following reasons as set forth herein.

17      189.   Such a demand would be a futile and useless act because there is a reasonable

18  doubt that: (1) the Board's actions that damaged the Company were the product of a valid

19  exercise of business judgment; and/or (2) a majority of the current eleven-member Board is

20  capable of making an independent and disinterested decision about whether to institute and

21  vigorously prosecute this action.

22      **A.   The Board's Actions Were Not Valid Exercises of Business Judgment**

23      190.   The Board's decision to violate the federal antitrust laws by engaging in the

24  illegal, anticompetitive hiring practices detailed herein was not a valid exercise of business

25  judgment.

26

27

28

191.    The Board's decision to cause and/or allow the Company to enter into illegal, anticompetitive agreements with several of the Company's competitors was not a valid exercise of business judgment.

192.    The Board's decisions to reward wrongdoers through compensation were not valid exercises of business judgment.

**B.    Demand Is Futile Because the Complaint Alleges Facts Creating a Reasonable Doubt that a Majority of the Board Is Independent and Disinterested for Purposes of Considering a Demand**

193.    A majority of the Board has a strong interest in refusing to bring the claims asserted by Plaintiff to protect themselves against a substantial likelihood of liability for violating the federal antitrust laws that disqualifies them from considering demand.  Ten directors on Google's 11-member Board, including Director Defendants Page, Brin, Schmidt, Doerr, Greene, Hennessy, Mather, Otellini, Shriram, and Tilghman, sat on the Google Board during the relevant period and knew about the wrongful conduct described herein at the time it was occurring.  Each of these ten directors knew of the wrongdoing and either actively orchestrated it or acquiesced in it.  Accordingly, each of these current directors faces a substantial likelihood of liability for causing and/or allowing Google to violate the federal antitrust laws by engaging in the illegal, anticompetitive behavior alleged herein.

**C.    Demand Is Futile Because a Majority of the Board Faces a Substantial Likelihood of Liability for Breaching Their Fiduciary Duty to Google**

194.    The same ten directors also face a substantial likelihood of liability for breaching their fiduciary duty to Google.  These ten individuals had an obligation to ensure that Google complied with the law that they actively shirked.  Faced with knowledge that Google was engaging in illegal, anticompetitive hiring practices, these ten Defendants caused or allowed the Company to continue its misconduct.  These anticompetitive non-solicitation agreements allowed the companies involved, including Google, to enter into, maintain, and enforce anticompetitive non-solicitation agreements that prevented each other from soliciting, cold calling, recruiting, and otherwise competing for employees without any procompetitive justification.  These agreements were broader than reasonably necessary for any collaboration

between the companies involved, including Google, and were deemed *per se* unlawful by the DOJ. "Delaware law does not charter law breakers." *In re Massey Energy Co.*, C.A. No. 5430-VCS, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011). Based on these facts, there is a substantial likelihood that Plaintiff will be able to prove that these ten individuals breached their fiduciary duties of loyalty and good faith. The Director Defendants' acts and omissions amounted to a breach of fiduciary duty, abuse of control, gross mismanagement, and waste of corporate assets because Google's non-solicitation agreements eliminated a significant form of competition to attract highly skilled employees, reducing the Company's ability to compete for high-tech workers and subjecting Google to criminal and civil prosecution for violations of federal antitrust law. Accordingly, these ten individuals are disqualified from evaluating a demand and demand is therefore futile.

195. As detailed herein, Defendants Page, Brin, Schmidt, and Otellini breached their fiduciary duties of good faith and loyalty by directly creating, ratifying, or implementing the illegal, anticompetitive anti-solicitation agreements.

196. Furthermore, Defendants Doerr, Hennessy, Mather, Shriram, and Tilghman also breached their fiduciary duties by blindly ignoring the unlawful scheme and failing to prevent Defendants Page, Brin, and Schmidt from controlling Google with no effective oversight. In addition, these Defendants knowingly or recklessly approved or acquiesced to violations of law by Defendants Page, Brin, Schmidt, and Otellini in failing to implement adequate internal controls to prevent such violations.

197. The Director Defendants, with the exception of Defendant Greene, were either aware of or consciously and blindly disregarded the illegal anticompetitive agreements. As detailed herein, and as noted by Judge Koh in the Antitrust Class Action, ample evidence, including internal Google emails and documents, exists to implicate the highest levels of executives and directors at Google in the wrongdoing. Moreover, sworn testimony has identified that the entire Board knew about the misconduct. Google actively worked to conceal these

1    illegal agreements from the public eye, even though it was well known within the Company and

2    within the industry that these agreements were widespread and enforced.

3          198.   To date, the Director Defendants have still failed to seek to recover for the

4    Company for any of the wrongdoing identified by Plaintiff herein.  For all these reasons, a

5    majority of the current Google Board of Directors is incapable of independently and fairly

6    evaluating a demand to bring an action against themselves and other Google executives.

7          **D.**    **Demand Is Futile Because Defendants Page, Brin, and Schmidt**
               **Dominate and Control the Google Board of Directors**

8

9          199.   Defendants Page, Brin, and Schmidt dominated the Google Board of Directors by

10    controlling shareholder voting power.  As of March 17, 2014, Defendant Page alone controlled

11    28.1% of the shareholder voting power; Defendant Brin alone controlled 27.6% of the

12    shareholder voting power; and Defendant Schmidt alone controlled 5.5% of the shareholder

13    voting power.  Accordingly, these three Defendants combined control a majority of the Google

14    Board of Directors, controlling over 61% of the shareholder voting power.  Indeed, these three

15    Defendants have controlled a majority of the shareholder voting power since before Google even

16    began entering into anticompetitive hiring agreements.  As disclosed in Google's most recent

17    Annual Report on Form 10-K filed with the SEC on February 12, 2014, Defendants Page, Brin,

18    and Schmidt "have significant influence over management and affairs and over all matters

19    requiring stockholder approval, including the election of directors and significant corporate

20    transactions . . . for the foreseeable future."  The other Director Defendants are and have been

21    completely under the domination of Defendants Page, Brin, and Schmidt, preventing them from

22    taking remedial action against Defendants Page, Brin, and Schmidt.  As majority shareholders,

23    Defendants Page, Brin, and Schmidt have the power to not re-elect any director who votes to

24    discipline them for their improper acts.  Accordingly, demand is futile.

25          **E.**    **Demand Is Futile Because a Majority of Google's Board Faces a**
               **Substantial Likelihood of Liability for Violating Section 14(a) of the**
               **Exchange Act**

26

27          200.   As described above, ten culpable Director Defendants caused Google to

28    disseminate false and misleading proxies between 2012 and 2014, in violation of Section 14(a)

of the Exchange Act.  These Proxies harmed Google by interfering with the proper governance of the Company that would have followed a fully informed shareholder vote.  Based on these facts, there is a substantial likelihood that these ten individuals are liable under Section 14(a) of the Exchange Act.  In addition, there is a substantial likelihood that these same ten directors are liable for breach of their fiduciary duties owed to the Company.  Accordingly, these ten individuals are disqualified from hearing demand and demand is therefore futile.

### F.    Additional Demand Futility Allegations

201.    The Director Defendants, with the exception of Defendant Greene, were either involved in creating, implementing, overseeing, or enforcing Google's employment policies and/or anticompetitive agreements, or not independent of those who engaged in such acts.

202.    ***Defendants Page, Brin, Schmidt, and Otellini*** orchestrated and were directly involved in Google's anticompetitive agreements.   Defendants Doerr, Hennessy, Mather, Shriram, Tilghman, and Greene are not independent of Page, Brin, and Schmidt due to their close professional and personal relationships.   These relationships have caused conflicts of interest precluding Defendants Doerr, Hennessy, Shriram, Mather, Tilghman, and Greene from taking any necessary and proper steps against Page, Brin, and Schmidt on behalf of Google as requested herein.   None of the present members of the Google Board of Directors, with the exception of non-party Mulally, are disinterested.

### Page and Brin

203.    ***Defendants Page and Brin*** co-founded Google in 1998, after having met at Stanford University in 1995.  Defendants Page and Brin, as alleged herein, were intimately involved in the implementation, development, ratification, and enforcement of the illegal, anticompetitive non-solicitation agreements that Google entered into with other Silicon Valley companies.  Furthermore, Defendants Page and Brin are the final decision makers at Google for all major decisions.  Defendants Page and Brin both issued the false and misleading Proxy Statements sent to Google's shareholders between 2012 and 2014.  Defendants Page and Brin

were intimately involved in the creation, ratification, and implementation of the illegal covenants.  For example, in the Antitrust Class Action, Judge Koh has noted:

- "On the same day, Mr. Campbell sent an email to Mr. Brin and to Larry Page (Google CoFounder) stating, 'Steve just called me again and is pissed that we are still recruiting his browser guy.' . . .  Mr. Page responded '[h]e called a few minutes ago and demanded to talk to me.'"

- "Google promptly scrapped the plan, and the Google executive responded deferentially to Mr. Jobs, stating, 'Steve, Based on your strong preference that we not hire the ex-Apple engineers, JeanMarie and I decided not to open a Google Paris engineering center.' . . . The Google executive also forwarded the email thread to Mr. Brin, Larry Page (Google Co-Founder), and Mr. Campbell."

- "A draft of the 'Do Not Call' list was presented to Google's Executive Management Group, a committee consisting of Google's senior executives, including Mr. Schmidt, Larry Page (Google Co-Founder), Sergey Brin (Google Co-Founder), and Shona Brown (former Google Senior Vice President of Business Operations). . . .  Mr. Schmidt approved the list. . . .  (email from Mr. Schmidt stating: 'This looks very good.')."

- "Google's response to competition from Facebook also demonstrates the impact of the alleged conspiracy.  Google had long been concerned about Facebook hiring's effect on retention.  For example, in an email to top Google executives, Mr. Brin in 2007 stated that 'the facebook phenomenon creates a real retention problem.' . . .  A month later, Mr. Brin announced a policy of making counteroffers within one hour to any Google employee who received an offer from Facebook."

See *High-Tech Employee*, 2014 WL 3917126, at *7-*10.

204.    Based on the foregoing, Defendants Page and Brin were intimately involved in the illegal misconduct detailed herein.  As two of the primary wrongdoers, they are incapable of impartially considering a demand to initiate litigation.  Thus, demand is futile with respect to Defendants Page and Brin.

### Schmidt

205.    ***Defendant Schmidt*** began working at Google in 2001 as Chief Executive Officer and has served on Google's Board of Directors ever since.  Since April 2011, Defendant Schmidt has served as Google's Executive Chairman.  Defendant Schmidt has a close relationship with Defendants Page and Brin, and with them, has control over decisions at Google.  Defendant Schmidt also served on Apple's Board of Directors between August 2006 and July 2009, during

a substantial portion of the period of wrongdoing alleged herein. Defendant Schmidt approved of the "Do Not Cold Call" list of companies, instructed Google employees to keep the anticompetitive non-solicitation agreements secret, communicated with Jobs and other executives at other companies about the illegal agreements, instructed Google employees to implement the agreements, and ratified the termination of employment for those Google employees who did not comply. Defendant Schmidt's mentor at Apple is Bill Campbell, Chairman of Intuit. Defendant Schmidt issued the false and misleading Proxy Statements sent to Google's shareholders between 2012 and 2014. Defendant Schmidt was intimately involved in the creation, ratification, implementation, and enforcement of the illegal covenants. For example, in the Antitrust Class Action, Judge Koh has noted:

- "The evidence against Google is equally compelling. Email evidence reveals that Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO) terminated at least two recruiters for violations of anti-solicitation agreements, and threatened to terminate more. As discussed above, there is direct evidence that Mr. Schmidt terminated a recruiter at Steve Jobs' behest after the recruiter attempted to solicit an Apple employee. Moreover, in an email to Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google), Mr. Schmidt indicated that he directed a for-cause termination of another Google recruiter, who had attempted to recruit an executive of eBay, which was on Google's donot-cold-call list . . . . Finally, as discussed in more detail below, Mr. Schmidt informed Paul Otellini (CEO of Intel and Member of the Google Board of Directors) that Mr. Schmidt would terminate any recruiter who recruited Intel employees."

- "Moreover, there is evidence that Google executives knew that the anti-solicitation agreements could lead to legal troubles, but nevertheless proceeded with the agreements. When Ms. Brown asked Mr. Schmidt whether he had any concerns with sharing information regarding the 'Do Not Call' list with Google's competitors, Mr. Schmidt responded that he preferred that it be shared 'verbally[,] since I don't want to create a paper trail over which we can be sued later?' . . . . Ms. Brown responded: 'makes sense to do orally. i agree.'"

- "Google's impact on the labor market before the anti-solicitation agreements was best summarized by Meg Whitman (former CEO of eBay) who called Mr. Schmidt 'to talk about [Google's] hiring practices.' . . . As Eric Schmidt told Google's senior executives, Ms. Whitman said 'Google is the talk of the valley because [you] are driving up salaries across the board.' . . . A year after this conversation, Google added eBay to its do-not-cold-call list."

See *High-Tech Employee*, 2014 WL 3917126, at *9-*11.

206.   Based on the foregoing, Defendant Schmidt was intimately involved in the illegal misconduct detailed herein. As one of the primary wrongdoers, he is incapable of impartially

considering a demand to initiate litigation.  Thus, demand is futile with respect to Defendant Schmidt.

### Doerr

207.  ***Defendant Doerr*** was one of the earliest investors in Google, and has served on the Company's Board of Directors continuously since May 1999.  Defendant Doerr has also served on the boards of several other Silicon Valley tech companies, including Amyris, Inc. since May 2006, Zynga, Inc. since April 2013, and Amazon from 1996 to 2010.  Defendant Doerr issued the false and misleading Proxy Statements sent to Google's shareholders between 2012 and 2014.  Defendant Doerr works as a General Partner at Kleiner Perkins Caufield & Byers ("Kleiner Perkins"), and has since August 1980.  Years ago, through Kleiner Perkins, Defendant Doerr met Defendants Page and Brin.  At their initial meeting, Defendant Doerr asked Defendants Page and Brin: "[h]ow big do you think this can be?"  Defendant Page replied: "Ten billion."  As a Google-approved novel recounting this meeting directs:

> [Defendant] Doerr just about fell off his chair.  Surely, he replied to Page, you can't be expecting a market cap of $10 billion.  Doerr had already made a silent calculation that Google's optimal market cap – the eventual value of the company – could go maybe as high as one billion dollars.  "Oh, I'm very serious," [replied Defendant Page], "[a]nd I don't mean market cap.  I mean revenues."[8]

Defendant Doerr also regularly scouts at Stanford for ideas, and describes the University, where Defendant Hennessy serves as President and Defendants Page and Brin were once students and conceived of Google, as the "germplasm for innovation.  I can't imagine Silicon Valley without Stanford University."

208.  Over the course of his many years of close association with Google, Defendant Doerr has sought and obtained significant investments from Google for private companies in which Kleiner Perkins is a major investor.  In 2007, Google bought Peakstream, Inc. for $20.3 million.  Kleiner Perkins was a part owner of Peakstream and received approximately 24.5% of that sum.  Kleiner Perkins also invested in Intuit (one of the other primary wrongdoers involved in the illegal anticompetitive scheme).  Since 2008, Google has invested $47.5 million in

---

[8]    Steven Levy, In the Plex: How Google Thinks, Works, and Shapes Our Lives (Simon & Schuster 2011).

1  companies that Kleiner Perkins has also invested in.   In 2010, at the direction of Defendants

2  Page, Brin, and Schmidt, Google invested over $21 million in companies in which Kleiner

3  Perkins has a substantial interest.

4          209.    Again, Defendant Doerr was one of the earliest investors in and Board members

5  of Google.   When Defendant Doerr joined the Google Board, he recommended that Defendant

6  Schmidt use Bill Campbell as a coach and mentor.   Campbell, who is involved in the anti-

7  solicitation agreements, remains a close advisor to Defendant Schmidt.   "I think John Doerr

8  would say Bill Campbell saved Google," said Kleiner Perkins partner Will Hearst.   "He coached

9  [Defendant Schmidt] on what it means to be a CEO, not the CEO of Novell but of a company

10 like Google.   He taught [Defendant Schmidt] it's a lot like being a janitor.   There's a lot of shit

11 you have to do.   And he spent a lot of time with [Defendant Page] and [Defendant Brin],

12 explaining the difference between being a cool company or a smart company and being a

13 successful company."   Intuit, as alleged herein, was on Google's "Do Not Cold Call" list by

14 April 2006, in significant part because Defendant Doerr was also a director at Intuit at that time.

15        210.    Defendant Doerr and Campbell have had a close business relationship for

16 decades, and Defendant Doerr has backed entrepreneurs like Campbell, Scott D. Cook of Intuit,

17 Jeffrey P. Bezos of Amazon.com, and Mark Pincus of Zynga, Inc.   Kleiner Perkins was an early

18 investor in Sun Microsystems, where Defendant Schmidt held various positions from 1983 to

19 1997.   In fact, in 1996, Kleiner Perkins formed a $100 million fund to invest in companies that

20 would create software and related products based on the Java programming language developed

21 by Sun Microsystems.

22        211.    Defendants Doerr and Shriram have had a close relationship dating back to 1994.

23 Defendant Doerr also directed early venture capital funding to Netscape Communications Corp.

24 in 1994, when Netscape was founded and Defendant Shriram was its Vice President.   Kleiner

25 Perkins paid $4 million in 1994 for around 25% of Netscape and profited from Netscape's initial

26 public offering and subsequent $4 billion acquisition by America Online, Inc. in 1999.

27 Defendants Doerr and Shriram traveled together to India in 2006.   Kleiner Perkins "and Shriram

28

1    are working together to make investments in Indian companies serving the domestic market.

2    The visit by [Kleiner Perkins] partners and Shriram to the country later this month is to meet

3    entrepreneurs as well as business and political leaders," said Sandeep Murthy, who represented

4    both Shriram's venture capital firm Sherpalo Ventures, LLC, and Kleiner Perkins, in India.[9]

5            212.    Based on the foregoing, Defendant Doerr is incapable of impartially considering a

6    demand to initiate litigation against Defendants Page, Brin, or Schmidt.  Furthermore, he is not

7    independent of Defendants Page, Brin, Schmidt, or Shriram.  Thus, demand is futile with respect

8    to Defendant Doerr.

9                                     **Greene**

10           213.    **Defendant Greene** has served on Google's Board of Directors since January 2012

11    and has also been a member of the Intuit Board of Directors since August 2006.  Defendant

12    Greene issued the false and misleading Proxy Statements sent to Google's shareholders between

13    2012 and 2014.  Defendant Greene served on Intuit's Board when Intuit and Google entered into

14    their illegal non-solicitation agreement, which began no later than 2007.  Non-party Campbell,

15    Defendant Schmidt's mentor and Defendant Doerr's longtime friend, was Chairman of Intuit's

16    Board when Greene was named thereto.  Defendant Greene and Defendant Campbell worked

17    closely together and were also both early and major investors of Rockmelt, maker of a new

18    social browser, which was acquired by Yahoo! Inc. in 2013.  Based on the foregoing, Defendant

19    Greene is incapable of impartially considering a demand to initiate litigation against her

20    colleagues on the Google Board of Directors.  Thus, demand is futile with respect to Defendant

21    Greene.

22                                  **Hennessy**

23           214.    **Defendant Hennessy** is the President of Stanford University.  Google, at the

24    direction of Defendants Page and Brin (both alumni of Stanford), donates millions of dollars to

25    Stanford every year.  Since 2006, Google has donated no less than $14.4 million each year to

26

27    [9]      Ishani Duttagupta, *Moneybag VCs Shriram, Doerr set sail from US.*  THE TIMES OF INDIA, Jan. 9, 2009,

28    http:economictimes.indiatimes.com/articleshow/1363995.cms?utm_source=contentofinterest&utm_medium=text&utm_campaign=cppst. Visited Mar. 18, 2015.

Stanford.   Defendant Hennessy's roles at Google and Stanford create tremendous conflict, putting Defendant Hennessy on both sides of a business relationship.   Google licenses its internet search technology from Stanford, where as noted above, Defendants Page and Brin created the Company and were students.   For its services, Stanford received shares in Google's initial public offering that the University later sold for $336 million, and Stanford continues to receive "modest" annual licensing fees from Google.   Paul Aiken, Executive Director of the Authors Guild, has called Defendant Hennessy's personal holdings in Google "a great concern," and says "there seems to be both a personal and institutional profit motive here."   In November 2006, Google also pledged $2 million to Stanford Law School's Center for Internet and Society.   This Center was founded by Stanford Professor Lawrence Lessing, who is known for his views that copyright laws are often too restrictive, a view espoused by Google.   Aine Donovan, Executive Director of the Ethics Institute at Dartmouth College, says Stanford should not have accepted this donation from Google because it is too narrowly tailored to benefit Google's corporate interests.   As she put it, "[i]t might as well be the Google Center."[10]

215.   Furthermore, in 2004, just a few months before Google's initial public offering, Google appointed Defendant Hennessy to its Board of Directors.   Defendant Doerr, one of Google's original investors and directors, first approached Defendant Hennessy.   Defendant Hennessy has invested money with Defendant Doerr's firm, Kleiner Perkins.   Google granted Defendant Hennessy 65,000 options to buy Google stock at $20 per share.   After Google's initial public offering, SEC filings show that Defendant Hennessy received 10,556 shares of Google stock as part of an earlier investment in a Kleiner Perkins fund.

216.   Defendant Hennessy has also attended a political dinner with Defendants Schmidt, Greene, and Levinson, and Steve Jobs at Defendant Doerr's house in February 2011.   Defendant Hennessy was the only non-business leader invited.[11]   Defendant Schmidt has stated

---

[10]     John Hechinger and Rebecca Buckman, *The Golden Touch of Stanford's President*, WALL STREET JOURNAL, Feb. 24, 2007, http://online.wsj.com/news/articles/SB117226912853917727. Visited Mar. 18, 2015.

[11]     Ken Auletta, *Get Rich U*, THE NEW YORKER, Apr. 30, 2012, http://www.newyorker.com/reporting/2012/04/30/120430fa_fact_auletta?currentPage=all. Visited Mar. 18, 2015.

1  that when Google looks for engineers, it starts at Stanford.  Five percent of Google's employees

2  are Stanford graduates.[12]

3      217.    Defendant Hennessy also issued the false and misleading Proxy Statements sent

4  to Google's shareholders between 2012 and 2014.  Based on the foregoing, Defendant Hennessy

5  is incapable of impartially considering a demand to initiate litigation against Defendants Page,

6  Brin, or Schmidt.  If he did so, he would risk losing millions of dollars in donations to the

7  university at which he serves as President.  In that capacity, one of Defendant Hennessy's

8  primary responsibilities is to maximize donations from Stanford alumni, and he would not risk

9  cutting or hindering ties with one of Stanford's most important donors.  Thus, demand is futile

10 with respect to Defendant Hennessy.

11                                      **Mather**

12     218.    ***Defendant Mather*** has served on Google's Board of Directors and as Chairman

13 of the Audit Committee continuously since November 2005.  Defendant Mather issued the false

14 and misleading Proxy Statements sent to Google's shareholders between 2012 and 2014.

15 Defendant Mather worked as the Executive Vice President, Chief Financial Officer, and

16 Company Secretary of Pixar from October 1999 to May 2004, one of the other companies

17 accused of the anticompetitive wrongdoing alleged herein.  While at Pixar, Defendant Mather

18 worked closely Apple's co-founder, Chairman, and Chief Executive Officer Steve Jobs, who was

19 also a majority shareholder in Pixar.  Based on the foregoing, Defendant Mather is incapable of

20 impartially considering a demand to initiate litigation against her colleagues on the Google

21 Board of Directors.  Thus, demand is futile with respect to Defendant Mather.

22                                      **Otellini**

23     219.    ***Defendant Otellini*** has served on the Google Board of Directors since 2004, and

24 is also the former President and Chief Executive Officer of Intel, another of the primary

25 wrongdoers involved in the anticompetitive scheme detailed herein.  Defendant Otellini issued

26

27 ─────────────

28 [12]    *Id.*

the false and misleading Proxy Statements sent to Google's shareholders between 2012 and 2014. In his joint capacities at Google and Intel, Defendant Otellini was intimately involved in the creation, ratification, and implementation of the illegal covenants. For example, in the Antitrust Class Action, Judge Koh has noted:

- "Finally, as discussed in more detail below, Mr. Schmidt informed Paul Otellini (CEO of Intel and Member of the Google Board of Directors) that Mr. Schmidt would terminate any recruiter who recruited Intel employees."

- "There is also compelling evidence against Intel. Google reacted to requests regarding enforcement of the anti-solicitation agreement made by Intel executives similarly to Google's reaction to Steve Jobs' request to enforce the agreements discussed above. For example, after Paul Otellini (CEO of Intel and Member of the Google Board of Directors) received an internal complaint regarding Google's successful recruiting efforts of Intel's technical employees on September 26, 2007 . . . ('Paul, I am losing so many people to Google . . . . We are countering but thought you should know.'), Mr. Otellini forwarded the email to Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO) and stated 'Eric, can you pls help here???' . . . . Mr. Schmidt obliged and forwarded the email to his recruiting team, who prepared a report for Mr. Schmidt on Google's activities. . . . The next day, Mr. Schmidt replied to Mr. Otellini, 'If we find that a recruiter called into Intel, we will terminate the recruiter,' the same remedy afforded to violations of the Apple-Google agreement. . . . In another email to Mr. Schmidt, Mr. Otellini stated, 'Sorry to bother you again on this topic, but my guys are very troubled by Google continuing to recruit our key players.' . . . Moreover, Mr. Otellini was aware that the anti-solicitation agreement could be legally troublesome. Specifically, Mr. Otellini stated in an email to another Intel executive regarding the Google-Intel agreement: 'Let me clarify. We have nothing signed. We have a handshake 'no recruit' between eric and myself. I would not like this broadly known.' . . . Furthermore, there is evidence that Mr. Otellini knew of the anti-solicitation agreements to which Intel was not a party. Specifically, both Sergey Brin (Google Co-Founder) and Mr. Schmidt of Google testified that they would have told Mr. Otellini that Google had an anti-solicitation agreement with Apple. . . . ('I'm sure that we would have mentioned it[.]') . . . ('I'm sure I spoke with Paul about this at some point.'). Intel's own expert testified that Mr. Otellini was likely aware of Google's other bilateral agreements by virtue of Mr. Otellini's membership on Google's board. . . . The fact that Intel was added to Google's do-not-cold-call list on the same day that Apple was added further suggests Intel's participation in an overarching conspiracy. . . . Additionally, notwithstanding the fact that Intel and Google were competitors for talent, Mr. Otellini 'lifted from Google' a Google document discussing the bonus plans of peer companies including Apple and Intel. . . . True competitors for talent would not likely share such sensitive bonus information absent agreements not to compete."

- "The Apple-Google agreement was discussed at Google Board meetings, at which both Mr. Campbell and Paul Otellini (Chief Executive Officer of Intel and Member of the Google Board of Directors) were present. . . . After discussions between Mr. Brin and Mr. Otellini and between Mr. Schmidt and Mr. Otellini, Intel was added to Google's do-not-cold-call list. Mr. Campbell then used his influence at Google to successfully lobby Google to add Intuit, of which Mr. Campbell was Chairman of the Board of Directors, to Google's do-not-cold-call list."

- "In light of the overlapping nature of this small group of executives who negotiated and enforced the anti-solicitation agreements, it is not surprising that these executives knew

of the other bilateral agreements to which their own firms were not a party.  For example, both Mr. Brin and Mr. Schmidt of Google testified that they would have told Mr. Otellini of Intel that Google had an anti-solicitation agreement with Apple. . . . ('I'm sure we would have mentioned it[.]') . . . ('I'm sure I spoke with Paul about this at some point.').  Intel's own expert testified that Mr. Otellini was likely aware of Google's other bilateral agreements by virtue of Mr. Otellini's membership on Google's board."

*See High-Tech Employee*, 2014 WL 3917126, at *9-*12, *15-*16.

220.   Based on the foregoing, Defendant Otellini was intimately involved in the illegal misconduct detailed herein.  As one of the primary wrongdoers, he is incapable of impartially considering a demand to initiate litigation.  Thus, demand is futile with respect to Defendant Otellini.

### Shriram

221.   **Defendant Shriram** was a founding member of the Google Board of Directors, and during Google's earliest days, he counseled Defendants Page and Brin every Monday morning and helped them to incorporate Google.  Defendant Shriram helped Defendants Page and Brin work out a licensing agreement with Stanford so that Stanford would benefit if Defendants Page and Brin were successful.  Per one publication, David Cheriton, a Stanford computer science professor, introduced Defendant Shriram to Defendants Page and Brin in 1998,[13] and Shriram made an investment of $250,000.  This makes Defendant Shriram one of Google's four angel investors.  Defendant Shriram also served as Vice President of Business Development at Amazon from August 1998 to September 1999, and Amazon is one of the companies with which Google entered into the illegal agreements alleged herein.

222.   As alleged herein, Google and several of the Director Defendants have extremely close ties with Stanford University.  Defendant Shriram is no exception, having served on Stanford's Board since December 2009.  Accordingly, Defendant Shriram works very closely with Defendant Hennessy (Stanford's President).  Defendant Shriram and his wife have served on Stanford's Parents' Advisory Board since 2006 and endowed the Shriram Family Professorship in Science Education.

---

[13]   KEN AULETTA, GOOGLED: THE END OF THE WORLD AS WE KNOW IT (The Penguin Press 2009).

223.   Moreover, as noted above, Defendant Shriram was the Vice President of Netscape in 1994, when Defendant Doerr directed early venture capital funding to Netscape.   Kleiner Perkins (Defendant Doerr's venture capital firm) paid $4 million in 1994 for 25% of Netscape and reaped tremendous profits from Netscape's initial public offering and eventual $4 billion acquisition by America Online, Inc. in 1999.   Moreover, as noted above with respect to Defendant Doerr, he and Defendant Shriram have maintained a very close relationship since they first began working together in 1994.

224.   Defendant Shriram also issued the false and misleading Proxy Statements sent to Google's shareholders between 2012 and 2014.   Based on the foregoing, Defendant Shriram is incapable of impartially considering a demand to initiate litigation against Defendants Page, Brin, or Doerr.   He is also not independent of Defendants Page, Brin, or Doerr.   Thus, demand is futile with respect to Defendant Shriram.

**Tilghman**

225.   ***Defendant Tilghman*** works as a Professor of Molecular Biology at Princeton University and was the President of Princeton University between June 2001 and June 2013. Defendant Schmidt has donated tens of millions of dollars to Princeton.   Defendant Schmidt is himself a graduate of Princeton and has served as a trustee of Princeton between 2004 and 2008, concurrently with Defendant Tilghman.   For one example, on October 13, 2009, Defendant Schmidt created a $25 million endowment fund at Princeton, which was accepted by then Princeton President Tilghman.   Defendant Tilghman stated "[w]e are deeply grateful to Eric [Schmidt] . . . not only for providing this support, but for providing the capacity and flexibility to make investments that are likely to have the broadest and most transformative impact."   When he served as trustee at Princeton, Defendant Schmidt had substantial control over Defendant Tilghman's compensation and employment.   Based on the foregoing, Defendant Tilghman is incapable of impartially considering a demand to initiate litigation against Defendant Schmidt.   If she did so, she would risk losing millions of dollars in donations to the university at which she serves as President.   In that capacity, one of Defendant Tilghman's primary responsibilities is to

1    maximize donations from Princeton alumni, and she would not risk cutting or hindering ties with

2    one of Princeton's significant donors.   Defendant Tilghman issued the false and misleading

3    Proxy Statements sent to Google's shareholders between 2012 and 2014.   Based on the

4    foregoing, Defendant Tilghman is incapable of impartially considering a demand to initiate

5    litigation.  Thus, demand is futile with respect to Defendant Tilghman.

6         226.    In the motion to dismiss order in *In re Google, Inc. S'holder Deriv. Litig.*, this

7    Court analyzed whether Google's directors exercised independence when making decisions

8    unrelated to the present lawsuit.  *See* No. 11-cv-4248, 2012 WL 1611064, at *7-*8 (N.D. Cal.

9    May 8, 2012).  While the Court granted the motion to dismiss there, the Court determined that

10   the plaintiffs did an "adequate job of setting forth actual financial ties and motivations that go

11   beyond the mere existence of a naked business relationship" with respect to Defendants Doerr,

12   Hennessy, Shriram, and Tilghman.  *Id.,* at *10.  Significantly, the Court also held that:

13            Given the factual nature of the independence inquiry, and in view of the concrete
              financial motivations that plaintiffs have alleged, such allegations are sufficient in
14            the court's view—when combined with the majority stockholder control that Brin,
              Page, and Schmidt have over the Board—to allege that neither Hennessy,
15            Shriram, Doerr, nor Tilghman were truly "independent directors capable of
              considering a demand.["]
16   *Id*.

17        227.    Even more so than in the previous, unrelated derivative litigation before this

18   Court (cited to in the preceding paragraph), Plaintiff has alleged the existence of interlocking

19   business, professional, and social relationships, in addition to financial alliances between

20   Defendants Page, Brin, and Schmidt, and the remaining Director Defendants.   These

21   relationships have resulted in conflicts of interest that disable the other Director Defendants from

22   considering a demand to institute an investigation into the misconduct alleged herein on behalf of

23   the Company.

24   **XI.    CAUSES OF ACTION**

**FIRST COUNT**
**Breach of Fiduciary Duty**
<u>**Against All Defendants**</u>

25

26

27        228.    Plaintiff incorporates by reference and realleges each and every allegation set

     forth above as if fully set forth herein.

28
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
65

229.   Defendants each owe (or owed) Google and its shareholders fiduciary duties of loyalty, good faith, candor, trust, and due care in managing the Company's affairs.

230.   As detailed above, Defendants breached their fiduciary duties of loyalty, good faith, and candor by permitting:

        a.    Google, its directors, and officers to violate federal laws and regulations and Google's own Code of Conduct; and

        b.    Google to engage in anticompetitive hiring practices to artificially deflate employee salaries and decrease employee mobility.

231.   As a direct and proximate result of Defendants' breaches of their fiduciary duties, Google has been damaged, not only monetarily, but also with regard to its corporate image and goodwill.  Such damage includes, among other things, the cost of defending Google against government investigations and the penalties, fines, other liabilities, attorneys' fees, and expenses associated with those investigations.  Such damage further includes any money that Google pays to the class in the Antitrust Class Action.

**SECOND COUNT**
**Violation of §14(a) of the Exchange Act**
**Against the Director Defendants**

232.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

233.   SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

234.   The Director Defendants exercised control over Google and caused Google to disseminate the false and misleading March 2014, April 2013, and May 2012 Proxies.  These Proxies materially misrepresented the manner in which nominees for Google's Board of

1    Directors were selected, the effectiveness of the Board's oversight of compliance issues at

2    Google, and the Board's compliance with Google's Code of Conduct.

3         235.    As stated herein, these Proxies contained untrue statements of material facts and

4    omitted to state material facts necessary to make the statements that were made not misleading,

5    in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  These

6    false statements and omissions were essential links in the election of the Director Defendants to

7    Google's Board of Directors and the continued mismanagement of Google.

8         236.    The written communications made by the Director Defendants described herein

9    constitute violations of Rule 14a-9 and §14(a) because such communications were materially

10    false and/or misleading and were provided in a negligent manner.

11         237.    At all relevant times to the dissemination of the materially false and/or misleading

12    Proxies, the Director Defendants were aware of and/or had access to the facts concerning

13    Google's operation.

14         238.    Google has been severely injured by this conduct and is entitled to damages and

15    equitable relief.

16                        **THIRD COUNT**
**Violation of §29(b) of the Exchange Act**
17                        <u>**Against the Director Defendants**</u>

18         239.    Plaintiff incorporates by reference and realleges each and every allegation set

19    forth above as if fully set forth herein.

20         240.    The Director Defendants each received incentive compensation and fees,

21    including stock awards, while engaging in conduct that violates §14(a) of the Exchange Act.

22    The Director Defendants' incentive compensation and fees should be rescinded under §29 of the

23    Exchange Act because these Defendants violated §14(a) by issuing false and misleading reports

24    to Google shareholders regarding the nature of, and responsibility for, violations of federal law

25    and regulations.  All of the payments the Director Defendants received are therefore voidable by

26    Google under §29(b) of the Exchange Act.

27

28

241.   Google is in privity with the Director Defendants with respect to the incentive compensation and fees provided by Google to these Defendants.  The Directors have engaged in prohibited conduct in violation of the securities laws as alleged herein.

242.   Google has been severely injured by the misconduct of the Director Defendants. Accordingly, Google is entitled to damages, *i.e.*, rescission of the incentives, compensation, and fees granted to the Director Defendants.

**FOURTH COUNT**
**Contribution and Indemnity**
**<u>Against all Defendants</u>**

243.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

244.   Google is alleged to be liable to various persons, entities, and/or classes by virtue of the same facts and circumstances as are alleged herein that gives rise to the Defendants' liability to Google.

245.   Google's alleged liability on account of the wrongful acts and practices related to the misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Defendants in connection with all such claims that have been, are, or may be in the future asserted against Google by virtue of Defendants' misconduct and breaches of fiduciary duty.  Plaintiff, on behalf of Google, has no adequate remedy at law.

246.   As a result of the foregoing, certain Directors and officers are liable, jointly and severally, for contribution and/or indemnification to the Company, including Defendants Page, Brin, Schmidt, Doerr, Greene Hennessy, Mather, Otellini, Shriram, Tilghman, Moritz, Levinson, Eustace, Kordestani, Rosenberg, Brown, and Geshuri.

## XII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment, as follows:

A.   Finding that a shareholder demand on the Google Board of Directors would have been a futile and useless act;

1       B.       Finding that Defendants have breached their fiduciary duties to the Company and

2   violated the federal securities laws;

3       C.       Against each of Defendants in favor of Google for the amount of damages

4   sustained by Google as a result of the breaches of fiduciary duties by each Defendant as alleged

5   herein, jointly and severally, in an amount to be determined at trial, together with pre- and post-

6   judgment interest at the maximum legal rate allowable by law

7       D.       Requiring Defendants to return to Google all compensation and remuneration of

8   whatever kind paid by Google during the time that they were in breach of the fiduciary duties

9   they owed to Google;

10      E.       Directing Defendants to establish, maintain, and fully fund effective corporate

11  governance and compliance programs to ensure that Google's directors, officers, and employees

12  do not engage in wrongful and illegal practices;

13      F.       Granting appropriate equitable and/or injunctive relief to remedy Defendants'

14  misconduct, as permitted by law;

15      G.       Awarding to Plaintiff the costs and disbursements of this action, including

16  reasonable attorneys' and experts' fees and expenses; and

17      H.       Granting any such other further relief as the Court may deem just and proper.

18  **XIII.  JURY TRIAL DEMANDED**

19      Plaintiff hereby demands a trial by jury.

20

21  Dated: March 23, 2015                  **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**

22                                          By:  _/s/ John Jasnoch_
                                            John Jasnoch
23                                          707 Broadway, Suite 1000
                                            San Diego, CA 92101
24                                          Telephone: (619) 233-4565
                                            Facsimile:  (619) 233-0508
25                                          Email: jjasnoch@scott-scott.com

26

27

28

1                           Thomas L. Laughlin, IV
                              Judith Scolnick

2                           SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
                              The Chrysler Building

3                           405 Lexington Avenue. 40th Floor
                              New York, NY 10174

4                           Telephone: (212) 223-6444
                              Facsimile:  (212) 223-6334

5                           Email: tlaughlin@scott-scott.com
                                        jscolnick@scott-scott.com

6

7                           David R. Scott
                          SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

8                           156 South Main Street, P.O. Box 192
                              Colchester, CT 06415

9                           Telephone: (860) 537-5537
                              Facsimile:  (860) 537-4432

10                         Email: david.scott@scott-scott.com

11                           *Attorneys for Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, _David Merrell_, on behalf of West Palm Beach Fire Pension Fund (the "Fund"), hereby declare and verify that the Fund is currently an owner of Google, Inc. ("Google" or the "Company") stock and has continuously been an owner of the Company's stock since at least as early as May 4, 2007. I have read the allegations of the complaint and confirm that this action is not collusive and that the Fund is capable and willing to fairly and adequately represent the interest of shareholders who are similarly situated in enforcing the rights of the Company.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of March, 2015, at _Palm Beach, Florida_.


West Palm Beach Fire Pension Fund